Grancid CAMILO–ROBLES,
Plaintiff, Appellee,

v.

Dr. Guillermo HOYOS and Dr. Hector
O. Rivera–Gonzalez, Defendants,
Appellants.

Grancid CAMILO–ROBLES,
Plaintiff, Appellee,

v.

Pedro A. TOLEDO–DAVILA,
Defendant, Appellant.

Grancid CAMILO–ROBLES,
Plaintiff, Appellee,

v.

Gilberto DIAZ–PAGAN, Defendant,
Appellant.

Grancid CAMILO–ROBLES,
Plaintiff, Appellee,

v.

Pablo SANTIAGO–GONZALEZ,
Defendant, Appellant.

Nos. 97–2260 to 97–2262 and 97–2264.

United States Court of Appeals,
First Circuit.

Heard Feb. 25, 1998.

Decided June 29, 1998.

Roberto Lefranc Romero, with whom Martinez Alvarez, Menendez Cortada & Lefranc Romero was on brief, for appellants Hoyos and Rivera–Gonzalez.

John F. Nevares, with whom Ayleen Charles, Lizzie Portela, and Smith & Nevares were on brief, for appellant Toledo–Davila.

Orlando Duran–Medero, with whom Ricardo R. Rodriguez Padilla Law Offices was on brief, for appellant Diaz–Pagan.

Roberto Santana Aparicio, with whom Marisol Vega Coputo and Del Toro & Santana were on brief, for appellant Santiago–Gonzalez.

Judith Berkan, with whom Peter Berkowitz was on brief, for appellee.

Before SELYA, Circuit Judge,
CAMPBELL, Senior Circuit Judge, and
STAHL, Circuit Judge.

SELYA, Circuit Judge.

After suffering indignities at the hands of an unstable police officer, plaintiff-appellee Grancid Camilo–Robles sued an array of defendants under 42 U.S.C. § 1983 (1994).[1] In due season, five such defendants, appellants here, moved for summary judgment on the ground of qualified immunity. The district court rejected their motions (in some instances without waiting for an opposition). Although the timing of the district court's ruling and the lack of any authoritative insight into the court's reasoning complicate our task, we affirm.

## I. BACKGROUND

Parking privileges denote special status in our motorized society, and emotions often run high when a parking space is at stake. This case vividly illustrates that verity.

On May 13, 1994, Miguel Diaz–Martinez, a police officer assigned to the Bayamon Criminal Investigation Corps (CIC), sought to park in an area reserved for judges at the Bayamon Judicial Center. Camilo–Robles, a security guard sworn to protect that hallowed ground, told Diaz–Martinez that he could not park there. In response to this perceived affront, Diaz–Martinez placed his hand on his gun, arrested Camilo–Robles, handcuffed him, shoved the prisoner into his (Diaz–Martinez's) police cruiser, and drove to the station house (pausing to punch Camilo–Robles in the stomach and slap him in the face). Upon their arrival, Diaz–Martinez forced the plaintiff to remove his belt and shoes and placed him in a cell with other detainees. Cooler heads prevailed, and

Diaz–Martinez's prey was released, uncharged, some three hours later.

Camilo–Robles sued Gilberto Diaz–Pagan (director of the Bayamon CIC), Pablo Santiago–Gonzalez (Bayamon area commander), and Pedro A. Toledo–Davila (superintendent of police). In addition to these high-ranking police officials, Camilo–Robles named a host of other defendants including *inter alia* two psychiatrists who worked for the police department, Drs. Guillermo Hoyos and Hector O. Rivera–Gonzalez. Invoking section 1983, Camilo–Robles alleged that these five named defendants (collectively, "the appellants") had deprived him of his civil rights by their deliberate indifference in carrying out their supervisory responsibilities (with the result that Diaz–Martinez, a demonstrably unstable officer, was allowed to remain on active duty).

The district court issued its scheduling order on February 21, 1996. In December of that year, the appellants filed summary judgment motions. Camilo–Robles responded on the merits to the psychiatrists' summary judgment motion, but served a cross-motion seeking additional time in which to oppose the police officials' motions, *see* Fed.R.Civ.P. 56(f), explaining that they had stonewalled during pretrial discovery. The district court granted this cross-motion without limit of time and referred all pending discovery matters to a magistrate judge. Lassitude set in, and the magistrate made no rulings until August 26, 1997. Two days later, the district court denied the appellants' summary judgment motions in a curt, two-page order. These appeals followed.

## II. A CAREER TO MAKE ST. SEBASTIAN WEEP

Because the allegations of liability and the defenses thereto hinge upon what actions the various defendants took (or should have taken) in light of Diaz–Martinez's flagitious history of violence, the latter's career is of great relevance. We extract the facts from the summary judgment record, resolving all con-

---

1. The record reflects considerable ambivalence as to the correct spelling of the plaintiff's Christian name. We resolve this uncertainty by emu-

lating the usage employed by Camilo–Robles in his appellate brief.

flicts in favor of the plaintiff. *See Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990).

Diaz–Martinez joined the police force as a cadet in March 1984. That December, he was suspended for an assault. Despite the suspension, he became a regular officer and served as such for the next five years. His record reflects numerous disciplinary infractions involving violent and/or threatening behavior—we count at least eighteen—many of which entailed unwarranted brandishing of his weapon. The denouement occurred in August 1989 when, after assaulting his wife, Diaz–Martinez entered the Catano police station, seized a shotgun, and held several gendarmes (including the acting police superintendent) hostage for several hours.

Subsequent to this bizarre display, Diaz–Martinez was committed involuntarily to a psychiatric hospital and diagnosed as schizophrenic. The hospital discharged him and three months later a police psychiatrist, Dr. Pagan–Davis, recommended that he be separated from the force and given a civilian position. The police department suspended Diaz–Martinez in 1990 and formally expelled him in 1991.

Justice sometimes moves in mysterious ways. Diaz–Martinez successfully appealed his expulsion and the police department reinstated him in May 1993. While on desk duty, he assaulted a civilian. Nevertheless, Drs. Hoyos and Rivera–Gonzalez found Diaz–Martinez free from mental illness and fit for active duty (with no restrictions) when they examined him in August. The department promptly rearmed him and assigned him to work in a high-tension neighborhood. On September 8, 1993 (the day following his return to active duty), Diaz–Martinez engaged in an altercation with two unarmed, law-abiding neighborhood residents. In the course of this fracas, he shot both of them, wounding one and killing the other. *See Diaz v. Diaz Martinez*, 112 F.3d 1, 2 (1st

Cir.1997) (summarizing the facts of that episode). The police department immediately confiscated his weapon.

After a self-imposed exile, Diaz–Martinez returned to desk duty in November 1993. On January 20, 1994, while still unarmed, Diaz–Martinez threatened to kill a fellow officer at the Bayamon Radio Center. Six days later, he was transferred to the Bayamon CIC. On February 28, 1994, Drs. Hoyos and Rivera–Gonzalez again examined Diaz–Martinez and again declared him ready for unrestricted active duty and fit to carry a weapon. The police department rearmed him forthwith.

The incident that sparked this suit occurred in May of 1994. The police department again expelled Diaz–Martinez that August. He eventually pled guilty to voluntary manslaughter in connection with the September 1993 shootings and was sentenced to serve a prison term.[2]

## III. THE LEGAL LANDSCAPE

Before tackling the vagaries of each defendant's appeal, we first must map the crossroads at which the qualified immunity doctrine and principles of supervisory liability under section 1983 intersect. We then discuss pertinent questions of appellate jurisdiction and pause to note the somewhat tentative nature of orders denying summary judgment in the qualified immunity context.

### A. *Qualified Immunity and Supervisory Liability.*

■■■ Federal law provides a cause of action when an individual, acting under color of state law, deprives a person of federally assured rights. *See* 42 U.S.C. § 1983. Public officials who stand accused of civil rights violations under section 1983 nonetheless can avoid liability for money damages by showing either that they did not violate a right clearly established under federal law or that they acted with objective legal reasonableness.[3]

---

**2.** We have merely skimmed the surface of Diaz–Martinez's checkered career. As noted above, he compiled an unenviable string of administrative complaints in a relatively brief span. Moreover, in January 1994, an internal police investigation (the Calderón Report) revealed that he had committed many other acts of violence and threat-

ened violence that did not culminate in administrative action.

**3.** For this purpose, a right is "clearly established" when the "contours of the right [are] sufficiently clear that a reasonable official would

**6**

*See Harlow v. Fitzgerald,* 457 U.S. 800, 819, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Buenrostro v. Collazo,* 973 F.2d 39, 42 (1st Cir. 1992).

The Supreme Court has emphasized that a section 1983 plaintiff must allege a violation of a clearly established right secured either by the Constitution or by some other federal law. *See County of Sacramento v. Lewis,* —— U.S. ——, —— n. 5, 118 S.Ct. 1708, 1714 n. 5, 140 L.Ed.2d 1043 (1998). Here, the plaintiff vaults this hurdle with room to spare. The right to be free from unreasonable seizure (and, by extension, unjustified arrest and detention) is clearly established in the jurisprudence of the Fourteenth Amendment (through which the Fourth Amendment constrains state action). The right to due process of law (and, by extension, to be free from police brutality) is likewise clearly established under the Fourteenth Amendment (through which the Fifth Amendment constrains state action).

We have not had occasion to address the question whether, to be liable under section 1983, a supervisor must have violated an independent, "clearly established" right, or whether a supervisor may be liable based only on his proximity to a subordinate's violation of a "clearly established" right. Other circuits, however, have addressed this interplay between the "clearly established" requirement and supervisory liability. We follow their lead and adopt an approach that comports with the core principle of qualified immunity by protecting supervisory officials from suit when they could not reasonably anticipate liability.

▪ When a supervisor seeks qualified immunity in a section 1983 action, the "clearly established" prong of the qualified immunity inquiry is satisfied when (1) the subordinate's actions violated a clearly established constitutional right, and (2) it was clearly established that a supervisor would be liable for constitutional violations perpetrated by his subordinates in that context. *See Doe v. Taylor Indep. Sch. Dist.,* 15 F.3d 443, 456 (5th Cir.1994); *Shaw v. Stroud,* 13 F.3d 791,

801 (4th Cir.1994). In other words, for a supervisor to be liable there must be a bifurcated "clearly established" inquiry—one branch probing the underlying violation, and the other probing the supervisor's potential liability.

▪ Here, both elements are satisfied. We already have noted that the plaintiff's clearly established rights were violated, *see supra* Part III(A), and it is equally well settled that a deliberately indifferent police supervisor may be held liable for the constitutional violations of his subordinates. *See Diaz,* 112 F.3d at 4.

The question, then, reduces to the test of objective legal reasonableness. This test does not serve as a proxy for liability, because even state actors who commit constitutional violations may be entitled to qualified immunity. *See, e.g., Ringuette v. City of Fall River,* 146 F.3d 1, 5 (1st Cir.1998); *Brennan v. Hendrigan,* 888 F.2d 189, 194 (1st Cir. 1989). Instead, the test's utility is restricted to the qualified immunity inquiry. In that milieu, the test provides a method for determining whether, in relation to a clearly established right, a defendant's conduct was (or was not) reasonable. Withal, objective legal reasonableness is a concept that grew up in the prototypical section 1983 context—a context in which a state actor ("A") inflicts injury directly on a victim ("V") in derogation of V's constitutionally-protected rights. Where the context shifts—as where A is not a direct actor (i.e., he himself did not perpetrate the seizure, detention, or assault of which V complains), but, rather, stands accused of permitting a third person ("B"), also a state actor, to violate V's rights—the test remains intact, but its focus shifts. In this tri-cornered situation, objective legal reasonableness (and, hence, qualified immunity) necessarily depends upon the relationship between A's acts or omissions and B's conduct.

▪ This brings us to the doctrine of supervisory liability, which holds that a supervisor (defined loosely to encompass a wide range of officials who are themselves re-

---

understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635,

640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

moved from the perpetration of the rights-violating behavior) may be liable under section 1983 if he formulates a policy or engages in a practice that leads to a civil rights violation committed by another. *See City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823–24, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). Notice is a salient consideration in determining the existence of supervisory liability. *See Febus–Rodriguez v. Betancourt–Lebron,* 14 F.3d 87, 93 (1st Cir.1994) (treating as "[a]n important factor ... whether [the supervisor] was put on notice of behavior which was likely to result in the violation of ... constitutional rights"). Nonetheless, supervisory liability does not require a showing that the supervisor had actual knowledge of the offending behavior; he "may be liable for the foreseeable consequences of such conduct if he would have known of it but for his deliberate indifference or willful blindness." *Maldonado–Denis v. Castillo–Rodriguez,* 23 F.3d 576, 582 (1st Cir.1994).

 To demonstrate deliberate indifference a plaintiff must show (1) a grave risk of harm, (2) the defendant's actual or constructive knowledge of that risk, and (3) his failure to take easily available measures to address the risk. *See Manarite v. City of Springfield,* 957 F.2d 953, 956 (1st Cir.1992). This formulation correctly implies that deliberate indifference alone does not equate with supervisory liability; a suitor also must show causation. *See Maldonado–Denis,* 23 F.3d at 582 (explaining that the supervisor must have "had the power and authority to alleviate [the violation]"). In other words, the plaintiff must "affirmatively connect the supervisor's conduct to the subordinate's violative act or omission." *Id.* This affirmative connection need not take the form of knowing sanction, but may include tacit approval of, acquiescence in, or purposeful disregard of, rights-violating conduct. *See id.*

 This returns us to the point of our beginning: the relationship between qualified immunity and supervisory liability. By definition, a defendant who claims qualified immunity must do so either on the theory that the asserted right is not clearly established or on the theory that the conduct attributed to him satisfies the test of objective legal reasonableness. *See Harlow,* 457 U.S. at 819, 102 S.Ct. 2727. Because the constitutional rights and supervisory liability doctrine that underlie Camilo–Robles's claim are clearly established, the qualified immunity analysis here turns on whether, in the particular circumstances confronted by each appellant, that appellant should reasonably have understood that his conduct jeopardized these rights. *See Ringuette,* 146 F.3d at 5; *Berthiaume v. Caron,* 142 F.3d 12, 14–15 (1st Cir.1998).

The inquiry into qualified immunity is separate and distinct from the inquiry into the merits. Consequently, courts are well-advised to separate "qualified immunity" analysis from "merits" analysis whenever practicable. In some circumstances, however, these inquiries overlap. So it is here: the appellants stand accused of culpable conduct in a setting that requires an inquiry into deliberate indifference (which is customarily a merits-related topic).

Given this setting, discerning whether a particular appellant's behavior passes the context-specific test of objective legal reasonableness to some extent collapses the separate "qualified immunity" and "merits" inquiries into a single analytic unit.[4] Such an approach is unusual, but we occasionally have engaged in precisely this sort of merits-centric analysis in the course of deciding questions of qualified immunity. *See, e.g., Morales v. Ramirez,* 906 F.2d 784, 787 (1st Cir. 1990) (explaining "that, in certain cases, some aspect of the merits may be inexorably intertwined with the issue of qualified immunity") (citation and internal quotation marks omitted); *Amsden v. Moran,* 904 F.2d 748, 753–58 (1st Cir.1990) (examining the substance of the plaintiff's due process claims to deter-

---

4. In one sense, this phenomenon is more apparent than real. Although the variables in the "qualified immunity" and "merits" equations may be the same, the standards to be applied to those variables differ substantially. Thus, rights-violating conduct that a factfinder could conclude supports a determination of liability nonetheless may fall within the wider band of objective legal reasonableness (and thus would support a judicial determination of qualified immunity). *See, e.g., Brennan,* 888 F.2d at 194.

mine the defendants' eligibility for qualified immunity).

We weave these strands together into a thread that binds these appeals. The plaintiff alleges a violation of clearly established constitutional rights and asserts that several defendants bear supervisory liability for that violation. Responding to these allegations, each defendant claims qualified immunity and, because both the rights in question and each defendant's susceptibility to supervisory liability are clearly established, these qualified immunity claims hinge on whether that defendant's conduct was objectively reasonable. Since our inquiry into objective legal reasonableness involves deliberate indifference, however, we are compelled to engage the merits to a greater extent than is usual.

### B. *Consideration Affecting Appellate Jurisdiction.*

Were we reviewing a district court's *grant* of summary judgment based on qualified immunity, our course would be clear: we would determine de novo whether the affected defendant was entitled to a favorable judgment as a matter of law. Here, however, the summary judgment motions were denied, not granted, and this fact complicates our analysis. In the qualified immunity realm, the dividing line between appealable and nonappealable denials of summary judgment is blurred.

■■■ Cases are clear enough at the extremes. We know, for instance, that when a motion for summary judgment that asserts qualified immunity is rejected, the denial cannot ground an interlocutory appeal if the operative question is "whether or not the pretrial record sets forth a genuine issue of fact for trial." *Johnson v. Jones,* 515 U.S. 304, 320, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995). Similarly, we know that the denial of such a motion is immediately appealable if the operative question is purely legal in nature. *See id.* at 319, 115 S.Ct. 2151. In fine, "a summary judgment order which determines that the pretrial record sets forth a

genuine issue of fact, as distinguished from an order that determines whether certain given facts demonstrate, under clearly established law, a violation of some federally protected right, is not reviewable on demand." *Stella v. Kelley,* 63 F.3d 71, 74 (1st Cir.1995); *accord Behrens v. Pelletier,* 516 U.S. 299, 306, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996).

Determining the existence *vel non* of appellate jurisdiction in cases closer to the equator is more difficult. Some examples may be useful. In *Diaz,* we determined that we lacked jurisdiction to entertain an interlocutory appeal from a pretrial decision denying qualified immunity because the decision turned on the existence of a factual conflict or on what the lower court perceived to be a factual conflict. 112 F.3d at 4–5. This contrasts with situations in which the district court assumes a set of facts and decides, as a matter of law, that those facts will not support a qualified immunity defense—in which event jurisdiction exists to entertain an immediate appeal. *See Behrens,* 516 U.S. at 313, 116 S.Ct. 834.

■■■ If this were not complex enough, the district judge is not legally obliged to explain the basis on which a denial of summary judgment rests. *See Johnson,* 515 U.S. at 319, 115 S.Ct. 2151 (acknowledging that "[d]istrict judges may simply deny summary judgment motions without indicating their reasons for doing so"); *Domegan v. Fair,* 859 F.2d 1059, 1065–66 (1st Cir.1988) (similar). When the district court's order is unilluminating, the appellate court must fend for itself. Anticipating the dilemma that such an inscrutable order may pose in the qualified immunity context, the Court prophesied "that a court of appeals may have to undertake a cumbersome review of the record to determine what facts the district court, in the light most favorable to the nonmoving party, likely assumed." *Johnson,* 515 U.S. at 319, 115 S.Ct. 2151. Hence, we must perform the equivalent of an archeological dig and endeavor to reconstruct the probable basis for the district court's decision.[5]

---

**5.** Of course, if the court of appeals simply cannot decipher the lower court's decisional calculus, then it has the option of remanding for clarification. This option should be used sparingly, how-

ever, for interlocutory appeals sometimes serve as a delaying tactic in meritorious cases, and the remand alternative invariably promotes further

■ Here, the district court denied the appellants' motions for summary judgment before the plaintiff filed oppositions to several of those motions. As a result of this hastiness, the data before the court were limited—and limited further by the appellants' apparent intransigence in furnishing discovery.[6] Withal, the district court had before it a great deal of information from sources such as the psychiatrists' summary judgment papers, the plaintiff's opposition to the psychiatrists' motion, and evidentiary materials submitted by a former codefendant in connection with an earlier summary judgment motion. The court also had before it all the appellants' moving papers (which contain more than a smidgen of intramural fingerpointing). The court was at liberty to consult all these sources, and we, too, can consult them in endeavoring to determine whether the court below based its decision on contested facts as opposed to a quintessentially legal judgment.[7]

### C. *A Note of Caution.*

Having performed the exercise described in Part III(B), *supra*, we conclude, for reasons made manifest in our subsequent discussion of the appellants' claims, that we have jurisdiction over all these appeals and that the lower court appropriately denied all four summary judgment motions. We note, however, that this endorsement of the district court's ruling has a somewhat tentative cast. We offer three pertinent observations.

■ First, our approach assumes, despite the awkwardness of the conceptual fit, that deliberate indifference cases are amenable to standard qualified immunity analysis—a proposition that logically may be debatable, but that nevertheless follows from the Supreme Court's broad pronouncements. *See, e.g., Harlow,* 457 U.S. at 819, 102 S.Ct. 2727. Second, a pretrial refusal to grant qualified immunity is only a way station in the travel of a case. When a defendant fails on a pretrial qualified immunity claim, he nonetheless can plead qualified immunity as an affirmative defense and resurrect the claim at trial. *See Ringuette,* 146 F.3d at 3–4; *King v. Macri,* 993 F.2d 294, 299 (2d Cir. 1993); *Vazquez Rios v. Hernandez Colon,* 819 F.2d 319, 329 (1st Cir.1987). Third, notwithstanding a pretrial rejection of qualified immunity, the merits remain open.

### IV. THE PSYCHIATRISTS

The plaintiff alleges that the psychiatrists, Drs. Hoyos and Rivera–Gonzalez, evaluated Diaz–Martinez on February 28, 1994, with complete indifference to the constitutional rights of others and recklessly declared him fit for duty and able to carry a weapon. The psychiatrists' joint summary judgment motion addressed this claim on two levels, positing that they enjoy (1) absolute immunity from suit under Puerto Rico law, and (2) qualified immunity from suit under federal law because their performance was objectively reasonable and, in any event, had no direct bearing on the decision to restore an armed Diaz–Martinez to active duty. We grapple with these asseverations in sequence.

### A. *Absolute Immunity.*

■ A district court's refusal to grant summary judgment on an absolute immunity claim is, generally speaking, within the scope of our appellate jurisdiction on interlocutory appeal.[8] *See Acevedo–Cordero v. Cordero–*

---

delay. In this instance, we do not believe that remand is essential.

6. Although the plaintiff's brief alludes to extra-record evidence that supposedly would have been brought to the district court's attention had that court acted more deliberately, we cannot consider this evidence. *See United States v. Kobrosky,* 711 F.2d 449, 457 (1st Cir.1983). Our task here is to examine the database that was before the district court when it ruled.

7. Although a district court must consider the information described in the parties' filings in compliance with a local rule such as D.R.R.Loc.R 311, and may choose to limit its consideration accordingly, the court can, if it so elects, mull any other evidence in the record. *See Little v. Cox's Supermarkets,* 71 F.3d 637, 641 (7th Cir.1995); *Stepanischen v. Merchants Despatch Trans. Co.,* 722 F.2d 922, 930 n. 2 (1st Cir.1983).

8. The Supreme Court has not yet decided whether the *Johnson v. Jones* framework applies to absolute immunity in the same way as it applies to qualified immunity. We need not resolve that question today.

*Santiago*, 958 F.2d 20, 21 (1st Cir.1992). In this instance, it invokes the Puerto Rico Medico–Hospital Professional Liability Insurance Act, which provides in pertinent part:

> No health service professional may be included as a defendant in a civil suit for damages due to malpractice caused in the performance of his/her profession while said health service professional acts in compliance with his duties and functions as an employee of the Commonwealth of Puerto Rico, its dependencies, instrumentalities and municipalities.

P.R.Laws Ann. tit. 26, § 4105 (1994). The psychiatrists contend that this statute immunizes them because they examined Diaz–Martinez pursuant to the terms of a contract purporting to free them from liability under section 4105 (incorrectly identified as section 5105). We do not agree.

In the first place, the statute on its face applies to "employees." The contract states that the psychiatrists are independent contractors, not employees, and the record at the very least raises unanswered factual questions anent the statute's applicability. *See, e.g., Flores Roman v. Ramos Gonzalez*, 127 P.R. Dec. 601, 608–09 (P.R.1990) (examining the relevant contract to determine whether a given defendant is an employee or independent contractor); *see also Nieves v. University of P.R.*, 7 F.3d 270, 273 (1st Cir. 1993) (discussing section 4105).

In the second place, even if section 4105 applies, it at most gives government-employed physicians immunity from claims brought under Puerto Rico law. A state-conferred immunity cannot shield a state actor from liability under section 1983. *See Martinez v. California*, 444 U.S. 277, 284 n. 8, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980) ("Conduct by persons acting under color of state law which is wrongful under 42 U.S.C. § 1983 ... cannot be immunized by state law.") (quoting *Hampton v. City of Chicago*, 484 F.2d 602, 607 (7th Cir.1973)). Indeed, a regime that allowed a state immunity defense

to trump the imposition of liability under section 1983 would emasculate the federal statute. *See id.* We therefore reject the proposition that absolute immunity entitled the psychiatrists to summary judgment.[9]

### B. *Qualified Immunity.*

Before confronting the psychiatrists' qualified immunity defense, we make a preliminary point. The psychiatrists are private practitioners, not government employees in the traditional sense. Consequently, one might wonder whether they could be liable at all under section 1983, or, if so; whether they would be entitled to qualified immunity even on a "best case" scenario. The answer to both questions is in the affirmative.

A private party's conduct is attributable to the state if the state "has so far insinuated itself into a position of interdependence with [the private party] that it must be recognized as a joint participant in the challenged activity." *Barrios–Velazquez v. Asociacion De Empleados Del Estado Libre Asociado*, 84 F.3d 487, 494 (1st Cir.1996) (citation and internal quotation marks omitted; alteration in the original). Here, the psychiatrists acted under contract with the police department to assist in a necessary departmental function: the evaluation of officers. Hence, the psychiatrists, virtually by their own admission (*see supra* Part IV(A)), are for purposes of this case state actors performing in concert with the department. As such, they are both subject to suit under section 1983 and eligible for the balm of qualified immunity. *See Rodriques v. Furtado*, 950 F.2d 805, 814 (1st Cir.1991) (extending qualified immunity to a physician who agreed to assist the police in a body cavity search).

That said, the psychiatrists' pretrial case for qualified immunity lacks force. First, perscrutation of the record discloses uncontested facts sufficient to permit us to exercise jurisdiction over their appeal. Second, those facts, construed favorably to Cam-

---

9. We do not pass upon the effectiveness *vel non* of section 4105 in regard to the plaintiff's pendent claims under Puerto Rico law. *See Morales,* 906 F.2d at 787 n. 2 ("It is perfectly obvious that

if pendent appellate jurisdiction is available at all [on an interlocutory qualified immunity appeal]—a matter on which we intimate no view—the doctrine's use is discretionary.").

ilo–Robles, adequately ground a tripartite conclusion (1) that Diaz–Martinez posed an unusually serious risk of harm, (2) that the psychiatrists had actual knowledge of the risk, and (3) that they failed to take readily apparent steps to alleviate that risk. Third, the assumed set of facts presented here reveals a reckless disregard for the rights of others that outstrips any band of protection afforded by the doctrine of qualified immunity in cases of deliberately indifferent conduct.

We see no need to differentiate between the two psychiatrists for present purposes; after all, they themselves have abjured such a course and presented a united front both below and on appeal. By like token, it seems unnecessary to rehearse all the facts that contribute to our conclusions. Instead, we offer a sampling.

- The psychiatrists approached the February 1994 evaluation with abundant foreknowledge of Diaz–Martinez's case, gleaned from their August 1993 evaluation of him and their ensuing certification that he was fit for active duty at that time.

- On September 1, 1993, a few days after they issued the August 1993 certification, the psychiatrists received a psychologist's report (the Sedra Report), dated July 14, 1993, which noted that Diaz–Martinez denied reality, that he was immature, impulsive, and anxious, and that "his tension level could make him ... act[ ] out." Dr. Sedra later described this last observation as equivalent to saying that Diaz–Martinez "could explode at any time." Despite receiving this report, the psychiatrists did not revisit their original certification of Diaz–Martinez as fit for duty, and seem to have ignored the Sedra Report during the February 1994 examination.

- On September 8, 1993, Diaz–Martinez shot two innocent civilians, thus confirming Dr. Sedra's warnings. Still, the psychiatrists (both of whom knew of that incident) nonetheless recertified Diaz–Martinez for rearming and active duty in February 1994 without an intervening psychological evaluation.

- To administer their government contract, the psychiatrists set up a system whereby each doctor would independently interview each referred officer, thus ensuring two detached opinions. Although the psychiatrists knew Diaz–Martinez's stunning history of violence, they nonetheless deviated from this protocol in their February 1994 evaluation. Indeed, their entire examination consisted of one joint interview.

- After conducting their joint interview, the psychiatrists declared Diaz–Martinez "fit to engage in all of the duties inherent to a law enforcement agent ... (including the use of a regulation weapon)," without carrying out any further investigation.

- By his own admission, Dr. Hoyos neglected to read the Calderón Report (which detailed numerous instances of Diaz–Martinez's aberrant behavior) before signing off on Diaz–Martinez's status. Dr. Rivera–Gonzalez, who did read the Calderón Report, brushed it aside as insufficient to warrant further investigation.

- There is no evidence to suggest that the psychiatrists requested or consulted Diaz–Martinez's current complaint history before they gave him a clean bill of health in February 1994.

The presence of these essentially uncontested facts strongly suggests that the district court denied the psychiatrists' motion for summary judgment as a matter of law. We therefore have appellate jurisdiction. See Behrens, 516 U.S. at 313, 116 S.Ct. 834.

Exercising that jurisdiction and reviewing the district court's decision de novo, we believe that under at least one plausible scenario depicted by these assumed facts—in which the psychiatrists did not comply with their own evaluation protocol, failed to credit or take seriously the psychologist's report, made only a cursory effort to gather relevant data, and virtually ignored the information that did come to their attention—the psychiatrists carried out an objectively unreasonable course of conduct.

Of course, the psychiatrists have a fallback position: they maintain that their conduct (whether or not objectively reasonable) did not cause harm to Camilo–Robles because they functioned merely as advisors and did not themselves make the decision to return a fully armed Diaz–Martinez to the streets. This contention is better suited to a discussion of the merits, but to the extent that some causal connection is necessary to find that a state actor has failed the test of objective legal reasonableness, that nexus exists here.

To be sure, the psychiatrists did not have official authority to rearm Diaz–Martinez and restore him to active duty. Nonetheless, the summary judgment record makes it pellucid that the psychiatrists knew that their certification of Diaz–Martinez would, in Dr. Hoyos's phrase, "most probably" result in the officer's immediate rearming and return to active duty—as it had in every other previous instance. The police superintendent likewise attested to the significance of the psychiatrists' role. According to him, once the examining psychiatrist "certifies in writing that [an officer] is authorized to bear arms . . . we proceed to give back the weapon." Then, too, the director of the Bayamon CIC stated that the psychiatrists—not the police hierarchy—made the decision to rearm Diaz–Martinez. Finally, the record permits a reasonable inference that the psychiatrists eschewed easily accessible steps to forestall the rearming of Diaz–Martinez and instead certified his fitness for unrestricted active duty. Because this is an adequate showing of causation to support a denial of qualified immunity, the psychiatrists' fallback position avails them naught.

## V. THE REMAINING APPELLANTS

The plaintiff alleges that the remaining three appellants have supervisory liability under section 1983 for their individual failures to keep Diaz–Martinez unarmed and away from the public. The affected appellants unanimously deny this averment. Their separate summary judgment motions maintain that, at the least, qualified immunity attaches. Consequently, we troll the record in search of facts bearing on the putative immunity of each appellant. We then examine those collected facts to determine the basis of the district court's decision (and, thus, the existence *vel non* of appellate jurisdiction). Lastly, we proceed to determine whether the district court erred in rejecting the qualified immunity defense.

### A. *Diaz–Pagan.*

The summary judgment record reveals the following uncontested facts concerning Diaz–Pagan.

- In January 1994, Diaz–Martinez joined the Bayamon CIC. Throughout his tenure there, Diaz–Pagan served as the unit's director.
- As director, Diaz–Pagan had the authority to oversee and countermand his subordinates' staffing decisions and/or to dispatch police officers for special human relations training to minimize the likelihood of future outbursts.
- Diaz–Pagan also possessed the authority to ensure that Diaz–Martinez would remain in an administrative position, removed from public contact.
- By early 1994, Diaz–Pagan had read the Calderón Report and was aware of Diaz–Martinez's extensive history of violence, including the 1989 hostage-taking incident, a 1993 death threat against Diaz–Martinez's landlord, the September 1993 shootings, and a very recent death threat against a fellow officer. This compendium of incidents led Diaz–Pagan to advise the area commander, Col. Pablo Santiago–Gonzalez, that Diaz–Martinez "displays a pattern of behavior which requires special attention."
- Notwithstanding the foregoing, Diaz–Pagan neither recommended Diaz–Martinez for special human relations training nor intervened to assure that Diaz–Martinez's assignments would insulate him from public contact.
- Diaz–Pagan did not alert his subordinates who were in charge of day-to-day operations to the risk that he himself foresaw.
- Despite his foreknowledge of the imminent danger that rearming Diaz–Martinez entailed, Diaz–Pagan did not take

any measures to influence whether Diaz–Martinez would be rearmed.

- Although he professed "surprise[ ]" when he learned (prior to the incident involving Camilo–Robles) that Diaz–Martinez's weapon had been restored, Diaz–Pagan acquiesced in that action and did not attempt to rescind it.

- When Diaz–Pagan left for vacation on April 18, 1994, he neglected to inform his temporary replacement, Capt. Jorge Hernandez–Colon, of Diaz–Martinez's disciplinary record.

### B. *Santiago–Gonzalez.*

The summary judgment record reveals the following uncontested facts concerning Santiago–Gonzalez.

- Santiago–Gonzalez served as Bayamon area commander during the time in question.

- Santiago–Gonzalez knew of Diaz–Martinez's violent history. He had received the Calderón Report and had personally overseen the efforts to calm the affected neighborhood in the wake of the 1993 double shooting.

- Diaz–Pagan identified Santiago–Gonzalez as his "boss" and as "the person who has control of the Area." Thus, the chain-of-command observations set forth as to Diaz–Pagan apply with at least equal force to Santiago–Gonzalez.

- The superintendent of police testified that: "It is the discretion of the Area Commander [Santiago–Gonzalez] to assign [officers] to the different units."

- Santiago–Gonzalez enjoyed the discretion to assign Diaz–Martinez to desk duty or other administrative work, yet failed to use this power to make certain that the rogue officer would not come in contact with the public.

### C. *Toledo–Davila.*

The summary judgment record reveals the following uncontested facts concerning Toledo–Davila.

- Toledo–Davila served as police superintendent throughout the time in question.

- The police superintendent is the only person empowered to assign a regulation weapon to a member of the police force, and has plenary discretion to withhold or confiscate a weapon in those cases in which he deems such action appropriate. *See* Puerto Rico Police Department Personnel Reg. § 9.3(1)(a), (d).

- Toledo–Davila knew the details of Diaz–Martinez's violent record. He also knew that the Puerto Rico Department of Justice had assumed control of the investigation into the September shootings, and that as of February 1994 its investigation was ongoing.

- Toledo–Davila abdicated his duty to exercise independent judgment in determining which officers should bear arms. In that respect, he stated that once a psychiatrist certifies an officer as fit for duty, "the superiors are notified . . . [a]nd then we proceed to give back the weapon."

### D. *Appellate Jurisdiction.*

After full consideration of the record, we believe that the district court supportably assumed a set of documented facts from which it denied the supervisors' motions for summary judgment as a matter of law. Consequently, we have jurisdiction to review the district court's decision.

Our rationale is straightforward. On the record as it stands, the facts as to these appellants' powers, functions, conduct, and omissions are not seriously disputed, nor are the facts as to what corrective measures were available to them. This makes it very likely that the district court assumed the facts to be as stated. That the district court did not wait for the plaintiff's opposition—a practice that we do not commend—buttresses this conclusion and suggests that the court did not believe it necessary for the plaintiff to adduce additional facts because the facts that already were in the record, assumed as true and interpreted favorably to the plaintiff, were insufficient as a matter of law to warrant the application of qualified immunity. Thus, we turn to the correctness of that conclusion, again taking the supervisors one by one.

### E. *Qualified Immunity—Diaz–Pagan.*

█ Diaz–Pagan trumpets that Diaz–Martinez was not under his direct command, and that, in all events, he was on vacation when Diaz–Martinez allegedly assaulted Camilo–Robles. Based largely on these undisputed facts, Diaz–Pagan maintains that he deserves qualified immunity because there is no causal link between his conduct and the assault on Camilo–Robles.

█ This argument speaks less to qualified immunity and more to the merits—and a denial of summary judgment on the merits, even in a section 1983 case, is not immediately appealable. *See Domegan,* 859 F.2d at 1061. Still, a plausible causal chain is relevant to the objective legal reasonableness of a state actor's conduct and, viewed in that light, Diaz–Pagan's contentions are not entirely off base. At any rate, on the assumed set of facts the court supportably could have concluded that Diaz–Martinez presented a serious risk of harm and that Diaz–Pagan knew as much; put another way, Diaz–Pagan "was put on notice of behavior which was likely to result in the violation of the constitutional rights of citizens." *Febus–Rodriguez,* 14 F.3d at 93. The court likewise could have concluded that Diaz–Pagan had the authority to prevent recurrences of Diaz–Martinez's erratic behavior, but nevertheless failed to take obvious steps within his power to reduce or eliminate that risk. Similarly, the court could have found the requisite causal connection. Finally, the court could have concluded that Diaz–Pagan's omission was outside the range of mistaken judgments that the qualified immunity doctrine protects. Seen in that light, Diaz–Pagan's conduct was not objectively reasonable and, thus, qualified immunity does not attach.[10]

### F. *Qualified Immunity— Santiago–Gonzalez.*

█ Santiago–Gonzalez similarly claims qualified immunity on the ground that the causal connection between his functions and Diaz–Martinez's transgressions is too attenu-

ated to justify the imposition of section 1983 liability. As above, we examine causation insofar as it bears on qualified immunity (i.e., as an element of objective legal reasonableness).

On the facts proffered by Santiago–Gonzalez and amplified elsewhere in the record, it is plain that Santiago–Gonzalez knew that Diaz–Martinez was a ticking time bomb and also knew (or should have known) that Diaz–Martinez, if restored to active duty, was likely to commit acts that would violate the constitutional rights of others. As was true of Diaz–Pagan, Santiago–Gonzalez had both the authority and the opportunity to prevent Diaz–Martinez from interacting with the public, yet failed to intervene. Accordingly, his indifference and the assault on Camilo–Robles were causally linked. In a nutshell, on the assumed set of facts revealed by the summary judgment record the district court supportably could conclude that Santiago–Gonzalez acted in an objectively unreasonable fashion, thus exempting his conduct from the prophylaxis of qualified immunity.

### G. *Qualified Immunity—Toledo–Davila.*

█ At the end of the day, Toledo–Davila maintains that he and the officers under his command followed proper police procedures when rearming Diaz–Martinez. He adds that in all events he acted in good faith—and qualified immunity protects officers who make good-faith mistakes. *See Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523. Although we find no evidence to suggest that Toledo–Davila (or the other appellants, for that matter) acted in bad faith, we nonetheless conclude that Toledo–Davila cannot wrap himself in the mantle of qualified immunity.

The extant record eloquently refutes Toledo–Davila's assertion that his conduct was, as a matter of law, objectively reasonable. Toledo–Davila knew of Diaz–Martinez's vicious propensities and the peril presented; he had the sole de jure responsibility to authorize rearming; and yet he treated Diaz–Martinez not as a dangerous sociopath, but as any

---

10. Diaz–Pagan's absence on vacation does not undermine this conclusion. His acts and omissions prior to his departure and his acknowledged failure to leave any special instructions concerning Diaz–Martinez with his stand-in sufficiently support the district court's denial of qualified immunity.

other officer. To cinch matters, a causal relationship existed between Toledo–Davila's conduct and the incident at the Bayamon Judicial Center. We think that the police superintendent's latitudinarian approach in the face of Diaz–Martinez's patent instability was so far outside the realm of reasonableness that it rendered him ineligible for protection under the qualified immunity doctrine.

## VI. CONCLUSION

We add an eschatocol of sorts. This is a hard case, for it does not readily fit the mold cast by the Court's precedents. We believe it is possible that the Court, when confronted with a claim of qualified immunity in a deliberate indifference case, may recognize the awkwardness of the fit and formulate a special set of rules to cover such situations. Until further guidance emerges, however, we have little choice but to apply the existing qualified immunity paradigm across the board. We have endeavored to do so here.

■ We need go no further. Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). In this case, none of the appellants consciously chose to violate the law. If the assumed facts indicated that they were merely inattentive or careless, then qualified immunity would shield them despite the fact that Diaz–Martinez violated the plaintiff's clearly established rights. *See, e.g., Ringuette*, 146 F.3d at 5–6; *Brennan*, 888 F.2d at 194. Here, however, indulging reasonable pro-plaintiff inferences, the record shows conduct on the appellants' part that can best be described as reckless and wanton—conduct that is emblematic of the plain incompetency to which the *Malley* Court alluded. The appellants' behavior is, therefore, outside the wide band of mistaken police judgments that the qualified immunity doctrine is intended to shield and the appellants, to a man, are not entitled to summary judgment.

*Affirmed. Costs in favor of appellee.*