<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                United States Court of Appeals
                    For the First Circuit

No. 98-1590

                     GRANCID CAMILO-ROBLES,

                      Plaintiff, Appellee,

                               v.

          JOSE R. ZAPATA, A/K/A JOSE R. ZAPATA-RIVERA,

                     Defendant, Appellant.

          APPEAL FROM THE UNITED STATES DISTRICT COURT

                FOR THE DISTRICT OF PUERTO RICO

       [Hon. Carmen Consuelo Cerezo, U.S. District Judge]

                             Before

                    Torruella, Chief Judge,
                                
                Coffin, Senior Circuit Judge,
                                
                  and Selya, Circuit Judge.
                                
                                

    John M. Garca with whom Orlando Fernndez and Garca &
Fernndez were on brief, for appellant.
    Judith Berkan, with whom Peter Berkowitz was on brief, for
appellee.

April 20, 1999

                                

 SELYA, Circuit Judge.  Plaintiff-appellee Grancid Camilo-
Robles seeks damages under 42 U.S.C.  1983 for indignities that he
suffered at the hands of a rogue officer of the Puerto Rico Police
Department, Miguel Daz-Martnez.  See Camilo-Robles v. Hoyos, 151
F.3d 1, 4 (1st Cir. 1998) (Camilo-Robles I) (describing incident),
cert. denied, 119 S. Ct. 872 (1999).  He contends, among other
things, that various officials in the police hierarchy were
deliberately indifferent to, and failed properly to supervise,
their notorious subordinate.  In an earlier opinion, we upheld the
district court's pretrial order denying qualified immunity to a
number of defendants in this action, including three high-ranking
police officials.  See id. at 9-15.
 The case returns today for the same purpose, but at the
behest of a different defendant:  Jos R. Zapata-Rivera (Zapata),
who served as the police department's Assistant Superintendent for
Administrative Investigations for roughly five months immediately
preceding Daz-Martnez's assault on Camilo-Robles.  The duties of
that post include the investigation of complaints about the conduct
of police officers and, when appropriate, the taking of corrective
action (which might include anything from a simple reprimand to
requiring retraining to recommending suspension or expulsion,
depending on the circumstances).  Camilo-Robles claims that, given
Daz-Martnez's widespread reputation as a bashi-bazouk, Zapata
manifested deliberate indifference to citizens' rights in leaving
him, armed and unregenerate, in a position in which he could
perpetrate further acts of brutality.
 Zapata denies any responsibility for the May 1994
encounter of which Camilo-Robles complains.  He maintains that he
performed his official duties in a proper and lawful manner; that
none of his acts or omissions violated Camilo-Robles's federally
protected rights; that the record evidence does not bespeak
deliberate indifference; and that, in all events, no causal
connection exists between his conduct and the incident in question.  
Zapata incorporated these arguments in a motion for summary
judgment asking, inter alia, that the district court declare him
qualifiedly immune from suit.  The court denied the motion in a
decurtate order, writing only "that there are issues of material
fact which preclude summary judgment."  This interlocutory appeal
ensued.
 Our analysis begins with bedrock.  Section 1983 provides
a private right of action against state actors   that is, public
officials acting under color of state law   who deprive individuals
of rights confirmed by federal constitutional or statutory law.  
Liability under that rubric is not strict or absolute.  The
qualified immunity doctrine constitutes one escape hatch.  In
practice, it holds harmless state actors whose behavior has
violated plaintiffs' rights as long as those rights were not at the
time clearly established under the Constitution or laws of the
United States.  See Harlow v. Fitzgerald, 457 U.S. 800, 818-19
(1982); Daz v. Daz-Martnez, 112 F.3d 1, 3 (1st Cir. 1997).
 The classic question that a qualified immunity defense
poses is whether the allegedly violated federal right was
established with sufficient clarity that a reasonable government
functionary should have conformed his conduct accordingly.  See,
e.g., Anderson v. Creighton, 483 U.S. 635, 638 (1987) (reiterating
that qualified immunity is meant to shield public officials "from
civil damages liability as long as their actions could reasonably
have been thought consistent with the rights they are alleged to
have violated").  In answering this question, a court must
undertake an objective inquiry into the totality of the
circumstances, with a view toward ascertaining whether the right
allegedly infringed, articulated at an appropriate level of
generality, was settled at the time of the public official's
actions, and if so, whether the official's conduct was obviously
inconsistent with that right.  See id. at 638-40.  In the last
analysis, then, qualified immunity purposes to protect government
functionaries who could not reasonably have predicted that their
actions would abridge the rights of others, even though, at the end
of the day, those officials may have engaged in rights-violating
conduct.  See id. at 639-41; see also Malley v. Briggs, 475 U.S.
335, 341 (1986) (explaining that qualified immunity protects "all
but the plainly incompetent or those who knowingly violate the
law").
 In the supervisory liability context, the qualified
immunity inquiry at times presents peculiar problems.  Under
prevailing jurisprudence, neither a finding of "no liability" nor
a finding of qualified immunity follows invariably upon a showing
that the defendant-supervisor's conduct, in and of itself, failed
directly to violate federally protected rights.  Thus, in a subset
of supervisory liability cases, courts facing the need to conduct
a qualified immunity analysis have been compelled to go beyond the
paradigmatic Harlow inquiry.  This, in turn, has given rise to
vexing questions of appellate jurisdiction.  We explain briefly.
 Although the Supreme Court has yet to speak explicitly on
the matter, it is common ground among the lower federal courts
that, for purposes of section 1983, supervisors sometimes may be
held accountable for their subordinates' misdeeds.  See Camilo-
Robles I, 151 F.3d at 6-7.  Since respondeat superior cannot serve
as a basis for such liability, see Board of County Comm'rs of Bryan
County v. Brown, 520 U.S. 397, 403 (1997) (collecting cases),
courts traditionally have required a showing that the superior
either was a primary actor involved in, or a prime mover behind,
the underlying violation.  The case law speaks of the necessity of
showing an affirmative link, whether through direct participation
or through conduct that amounts to condonation or tacit
authorization.  See Aponte Matos v. Toledo Davila, 135 F.3d 182,
192 (1st Cir. 1998); Braddy v. Florida Dep't of Labor & Emp. Sec.,
133 F.3d 797, 802 (11th Cir. 1998); Otey v. Marshall, 121 F.3d
1150, 1155 (8th Cir. 1997); Southard v. Texas Bd. of Crim. Justice,
114 F.3d 539, 550-51 (5th Cir. 1997).
 When a plaintiff premises his section 1983 claim on
allegations that the defendant-supervisor was a primary violator or
direct participant in the rights-violating incident, the qualified
immunity framework envisioned by Harlow and its progeny works quite
well.  In contrast, the framework engenders some confusion when
applied to cases in which the defendant-supervisor is sued as a
secondary or indirect violator.
 In such cases, liability attaches if a responsible
official supervises, trains, or hires a subordinate with deliberate
indifference toward the possibility that deficient performance of
the task eventually may contribute to a civil rights deprivation.  
See, e.g., Doe v. Taylor Indep. Sch. Dist., 15 F.3d 443, 453 (5th
Cir. 1994); Greason v. Kemp, 891 F.2d 829, 836-37 (11th Cir. 1990);
Sample v. Diecks, 885 F.2d 1099, 1116-17 (3d Cir. 1989); cf. City
of Canton v. Harris, 489 U.S. 378, 388-89 (1989) (explicating
deliberate indifference standard in a municipal liability setting).  
Under such a theory, a supervisor may be brought to book even
though his actions have not directly abridged someone's rights; it
is enough that he has created or overlooked a clear risk of future
unlawful action by a lower-echelon actor over whom he had some
degree of control.
 In these "neglect-of-risk" cases, confusion arises when
qualified immunity is factored into the mix because we accept by
hypothesis that the supervisor's actions have not, in themselves,
infringed on any federally protected right.  This means that,
unlike the typical section 1983 case, we cannot concentrate the
Harlow inquiry on the underlying right; if we did, the supervisor's
qualified immunity would depend entirely on the reasonableness of
the subordinate's actions, and such an approach would contravene
the axiom that the actions of persons sued in their individual
capacities under section 1983 must be assessed on their own terms.  
See Malley, 475 U.S. at 341; Harlow, 457 U.S. at 818-19.  Such an
approach also would frame the relevant inquiry in terms
disquietingly close to those involved in the forbidden doctrine of
respondeat superior.
 To resolve this enigma, courts consigned to struggle with
neglect-of-risk cases generally have incorporated a review of the
merits of derivative tort liability into the qualified immunity
calculus.  The ensuing analysis customarily centers around whether
the supervisor's actions displayed deliberate indifference toward
the rights of third parties and had some causal connection to the
subsequent tort.  See, e.g., Camilo-Robles I, 151 F.3d at 7-8;
Braddy, 133 F.3d at 802; Otey, 121 F.3d at 1155; Southard, 114 F.3d
at 554.  To the extent that this methodology heightens the
imbrication between merits and immunity inquiries, it is imperfect.  
See Mitchell v. Forsyth, 472 U.S. 511, 527-29 (1985) (discussing
the separateness of the two inquiries); Camilo-Robles I, 151 F.3d
at 7 (stating that "courts are well-advised to separate 'qualified
immunity' analysis from 'merits' analysis whenever practicable").  
Nonetheless, we use the methodology because it is what our
precedent (and that of almost every other circuit) requires for the
performance of this type of supervisory liability/qualified
immunity analysis.
 This methodological imperfection tends to exacerbate a
familiar jurisdictional quandary.  Interlocutory orders (such as
orders denying pretrial motions to dismiss or for summary judgment)
normally are not appealable as of right when entered.  See 28
U.S.C.  1291 (1994).  A different result sometimes obtains,
however, when a state actor unsuccessfully presses a pretrial
motion seeking the shelter of qualified immunity.  We say
"sometimes" because the jurisdictional waters are murky.  SeeCamilo-Robles I, 151 F.3d at 8 ("In the qualified immunity realm,
the dividing line between appealable and non-appealable denials of
summary judgment is blurred.").  Moreover, because the standard
qualified immunity framework fits neglect-of-risk cases awkwardly,
see id. at 7-9, efforts to distinguish appealable pretrial denials
of qualified immunity from non-appealable ones   always a Byzantine
endeavor   become even more difficult.
 Not every case is problematic.  The ground rules are
reasonably clear at either end of the jurisdictional continuum.  
The Supreme Court has held that the denial of a dispositive motion
bottomed on qualified immunity cannot support an interlocutory
appeal if the controlling question is "whether or not the pretrial
record sets forth a genuine issue of fact for trial."  Johnson v.
Jones, 515 U.S. 304, 319-20 (1995).  If, however, the "operative
question is purely legal in nature," an interlocutory appeal of
such an order is available.  Camilo-Robles I, 151 F.3d at 8 (citing
Johnson, 515 U.S. at 319).  In Stella v. Kelly, 63 F.3d 71 (1st
Cir. 1995), we described this dichotomy in the following way:  "a
summary judgment order which determines that the pretrial record
sets forth a genuine issue of fact, as distinguished from an order
that determines whether certain given facts demonstrate, under
clearly established law, a violation of some federally protected
right, is not reviewable on demand."  Id. at 74; accord Behrens v.
Pelletier, 516 U.S. 299, 306 (1996).
 Because of its focus on tort causation and culpability,
the qualified immunity analysis in neglect-of-risk cases seldom, if
ever, raises abstract questions of law about whether a right was
clearly established.  Moreover, the law is well-settled anent a
supervisor's liability for the conduct of his subordinates.  Thus,
in interlocutory appeals from the denial of qualified immunity in
this subset of cases, the jurisdictional question frequently falls
into the gray area, compelling the appellate tribunal to decide
whether the assertion of qualified immunity turns on the existence
of genuine issues of material fact (which is how the plaintiff
invariably will characterize the situation) or on a purely legal
entitlement to surcease under the relevant causation and
culpability standards, regardless of factual disputes (which is how
the defendant invariably will characterize the situation).
 This is the crux of the jurisdictional quandary that
confronts us today   and such quandaries become more intractable
where, as here, the lower court has done very little to clarify the
basis for its ruling.  Fortunately, this case comes equipped with
an unaccustomed luxury:  a prototype.  Between August 1990 and
December 1993 (when Zapata succeeded him), Toms Vazquez Rivera
(Vazquez) held the Assistant Superintendency.  On September 8,
1993, Daz-Martnez shot two persons (killing one and wounding the
other) while on active duty at the Barbosa Housing Project.  The
surviving victim and the decedent's family sued Daz-Martnez and
several police hierarchs, including Vazquez.  See Diaz, 112 F.3d at
2-3.  Vazquez sought unsuccessfully to be relieved of the burdens
of suit on qualified immunity grounds.  See id.  He then essayed an
interlocutory appeal.  In rejecting that initiative, we made two
pronouncements that are significant here.
 First, we accepted jurisdiction over Vazquez's purely
legal argument (which questioned the state of the law at and before
the time of the Barbosa Housing Project incident).  We concluded
that the applicable law, and, hence, the plaintiffs' asserted
right, was clearly established by 1993.  See id. at 4 (holding that
"it is beyond serious question that, at the times relevant hereto,
a reasonable police supervisor, charged with the duties that
Vazquez bore, would have understood that he could be held
constitutionally liable for failing to identify and take remedial
action concerning an officer with demonstrably dangerous
predilections and a checkered history of grave disciplinary
problems").  This conclusion applies full-bore in the case at hand
 and Zapata, to his credit, does not seriously argue to the
contrary.
 We then addressed Vazquez's fact-based assertion that the
trial court erred in refusing to grant his summary judgment motion
because the evidence did not show deliberate indifference on his
part.  See id. at 4-5.  We noted that the trial court had "rejected
this argument on the basis that the record contained controverted
facts," and held, therefore, that the determination was "not
reviewable on an interlocutory appeal."  Id.
 At first blush, it is difficult to remove the instant
case from Daz's precedential orbit.  Zapata tries; in an effort to
distinguish his situation, he bears down heavily on the fact that,
unlike Vazquez, he was in office only a short time when Daz-
Martnez accosted Camilo-Robles.  In this regard, he points out
that he assumed the Assistant Superintendent position in late 1993;
that, between then and May of 1994, he had only one concrete
opportunity to act with respect to Daz-Martnez; that his conduct
at that time, in and of itself, furnishes an insufficient
foundation for a claim of deliberate indifference; and that,
because of the brevity of his service, he, unlike his predecessor,
was not on notice of the incriminating details regarding Daz-
Martnez that subsequently came to light.  See Camilo-Robles I, 151
F.3d at 4-5 (chronicling Daz-Martnez's record); Diaz, 112 F.3d at
2-3 (same).  This lack of knowledge, he says, compels a conclusion
that he acted reasonably in not initiating corrective action vis--
vis Daz-Martnez prior to May of 1994.
    We agree with Zapata's main premise:  the extent of a
superior's knowledge of his subordinate's proclivities is a central
datum in determining whether the former ought to be liable (or
immune from suit) for the latter's unconstitutional acts.  SeeCamilo-Robles I, 151 F.3d at 7.  Here, however, the question of
notice is hopelessly factbound.  On one hand, Zapata argues, with
some evidentiary support, that he appropriately handled the sole
complaint that came to his attention because the investigator's
report concluded that the complainant (Flores-Miranda) had no
interest in proceeding and he (Zapata) had no other incriminating
information available to him at that time.  He was moreover,
entitled to rely, at least to some extent, on the work of his
predecessors and subordinates.  See Southard, 114 F.3d at 552-53;
Jones v. Wellham, 104 F.3d 620, 626-27 (4th Cir. 1997); Pacelli v.
deVito, 972 F.2d 871, 878 (7th Cir. 1992).  On the other hand,
Camilo-Robles counters, also with a measure of evidentiary support,
that Daz-Martnez's idiosyncrasies were well-known throughout the
constabulary; that Zapata, particularly, had enough knowledge
(however acquired) to create a duty to probe further and to
question the actions of others; that he acted recklessly in
terminating the investigation into the Flores-Miranda episode;
that the powers of his position were such that he could have acted
even without a formal complaint; and that the slightest effort on
his part would have uncovered easily available information (e.g.,
the truth about Daz-Martnez's role in the Barbosa Housing Project
shootings and the fact that Flores-Miranda declined to press his
complaint mainly because he feared Daz-Martnez) that would have
led any responsible supervisor to take corrective action.  The
facts that Camilo-Robles marshals, if known to Zapata, might well
justify a finding of deliberate indifference.  See, e.g., Andrewsv. Fowler, 98 F.3d 1069, 1078 (8th Cir. 1996) (concluding that
question of fact as to deliberate indifference existed where
supervisor knew of subordinate's prior misdeeds but did not take
timely action either to discipline or investigate); Gutierrez-
Rodriguez v. Cartagena, 882 F.2d 553, 566 (1st Cir. 1989)
(upholding a finding of supervisory liability when there was
evidence that the defendant had failed "to identify and take
remedial action" concerning his subordinate, and had maintained a
"grossly deficient" disciplinary system).
    We believe that the nature of the parties' debate
indicates the substantial extent to which it is fact-dependent.  
Given the brevity of Zapata's service as Assistant Superintendent,
the reasonableness of his actions hinges largely on what he knew
and when he knew it concerning subjects such as Daz-Martnez's
history and the status of ongoing investigations involving that
troubled officer.  See, e.g., Shaw v. Stroud, 13 F.3d 791, 799 (4th
Cir. 1994) (stating that documented widespread abuses put
supervisors on notice that they may be liable for subordinate's
future misconduct); cf. Bryan County, 520 U.S. at 411-12
(recognizing, in the negligent hiring context, that a municipality
may be liable if an applicant's background suggested that he would
be very likely, if hired, to commit specific constitutional
violations).  Despite the terseness of the district court's order,
we are confident that it analyzed the case in this manner and thus
perceived Zapata's claim to qualified immunity to turn upon
disputed questions of material fact.  Consequently, the court's
denial of qualified immunity is not reviewable on an interlocutory
appeal.  See Johnson, 515 U.S. at 313, 319-20; Diaz, 112 F.3d at 4-
5; Stella, 63 F.3d at 75-77.
    We need go no further.  In this instance, the state of
the record, the standards for summary judgment, and the fact-
intensive nature of derivative tort liability analysis all coalesce
to bring this case squarely into the Johnson realm.  Hence, we
dismiss Zapata's appeal, without prejudice, for want of appellate
jurisdiction.  This determination leaves open, of course, the
ultimate resolution of the qualified immunity issue.  See Behrens,
516 U.S. at 306-07; Camilo-Robles I, 151 F.3d at 9; Vazquez-Rios v.
Hernandez-Colon, 819 F.2d 319, 329 (1st Cir. 1987).

Appeal dismissed.  Costs to appellee.

</body>

</html>