## MARY JANE CLANCY vs. WILLIAM McCABE.

Suffolk. January 5, 2004. - March 26, 2004.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Civil Rights,* Supervisory liability, Immunity of public official. *Public Officer.*

This court concluded that a plaintiff motorist had not demonstrated that the
defendant, the superintendent of the State police, violated her federally
protected rights under 42 U.S.C. § 1983, where the defendant was not
deliberately indifferent to her constitutional rights as a matter of law in that
he gave a State trooper who had illegally strip searched the plaintiff a six-
month unpaid suspension and ordered him to report to the State police
stress unit for counselling, there was no evidence that the defendant had
failed to take adequate disciplinary measures against that trooper in prior
multiple instances of violations of citizens' rights, and the plaintiff failed to
show that the defendant's action or omission was affirmatively linked to
her injuries [317-322]; moreover, because a reasonable official in the
defendant's position could have believed his actions were lawful, the
defendant was entitled to qualified immunity [322-324]. IRELAND, J.,
dissenting.

CIVIL ACTION commenced in the Superior Court Department on
November 22, 1995.

The case was heard by *Mitchell J. Sikora,* J., on a motion for
summary judgment.

After review by the Appeals Court, the Supreme Judicial
Court granted leave to obtain further appellate review.

*Rosemary Connolly,* Assistant Attorney General, for the
defendant.

*James E. Riley, Jr., & Michael J. Traft (Rebecca L. Andrews*
with them) for the plaintiff.

SPINA, J. In November, 1992, State Trooper Ramon L. Rivera,
Jr., stopped the plaintiff's motor vehicle on Route 495 in
Middleborough. During the course of the stop, Rivera illegally
strip searched the plaintiff, Mary Jane Clancy, and made lewd

and suggestive remarks to her.[1] Five years prior to this incident, internal affairs had launched an investigation into Rivera's inappropriate and unprofessional conduct with four other female motorists. In 1988, as a result of the investigation, McCabe, who was then Commissioner of Public Safety and superintendent of State police, suspended Rivera without pay for six months and ordered him to report to the department's "stress unit" following his return to active duty.

The plaintiff's supervisory liability complaint against McCabe asserts a single count of civil rights violation. 42 U.S.C. § 1983 (2000). She alleges McCabe acted with deliberate indifference to the constitutional rights of female motorists by not recommending that Rivera be terminated in 1988. McCabe moved for summary judgment, claiming he was entitled to qualified immunity. McCabe further argued that the plaintiff could not prove that his allegedly negligent supervision of Rivera proximately caused her to be abused by Rivera.[2]

A Superior Court judge determined that there was "sufficient evidence" to reach a jury on the question whether McCabe's discipline of Rivera amounted to deliberate indifference, and denied McCabe's motion.[3] McCabe filed an interlocutory appeal with the Appeals Court, see *Breault* v. *Chairman of the Bd. of Fire Comm'rs of Springfield*, 401 Mass. 26, 30-31 (1987), cert.

---

[1]State Trooper Ramon L. Rivera, Jr., was convicted in 1995 of violating the plaintiff's State civil rights, attempted extortion, and open and gross lewdness. The Appeals Court affirmed the convictions. *Commonwealth* v. *Rivera*, 44 Mass. App. Ct. 1118 (1998). Rivera, who was terminated from the State police in 1995, was sentenced to from six to ten years at the Massachusetts Correctional Institution, Cedar Junction, and one year in a house of correction from and after the prison sentence.

[2]McCabe also moved for summary judgment on the ground that Rivera did not act "under color of state law" when he abused the plaintiff and thus his behavior did not violate her constitutional rights. The judge denied the motion on this ground as well, and McCabe does not argue the issue on appeal.

[3]While the judge did not explicitly address the causation issue in his memorandum of decision and order on McCabe's motion for summary judgment, he noted that "[s]tatements made by the parties regarding what a trial board may have done or what the courts may have done on appeal . . . are purely speculative and not relevant to the motion for summary judgment." The Appeals Court, however, concluded there was "a sufficient showing on this record to establish an affirmative causal link between McCabe's acts and omissions and [the plaintiff's] injuries." *Clancy* v. *McCabe*, 58 Mass. App. Ct. 498, 511-512 (2003).

denied sub nom. *Forastiere* v. *Breault,* 485 U.S. 906 (1988), arguing, inter alia, that there were no material facts in dispute on the issue of qualified immunity. In affirming the order denying summary judgment, the Appeals Court concluded that "it can be reasonably inferred that McCabe's supervisory response to Rivera's behavior was grossly inadequate." *Clancy* v. *McCabe,* 58 Mass. App. Ct. 498, 508 (2003). We granted McCabe's application for further appellate review. Because we hold that the disciplinary action taken by McCabe was not deliberately indifferent as a matter of law, and thus he is entitled to qualified immunity from suit under § 1983, see *Breault* v. *Chairman of the Bd. of Fire Comm'rs of Springfield, supra* at 31, we reverse the order of the Superior Court.

1. *Facts.* The background facts are set out at length in the Appeals Court decision, *Clancy* v. *McCabe, supra* at 500-502, and need not be repeated here. We recite only those facts on which the motion judge relied to support his denial of summary judgment on the question of qualified immunity, supplemented by uncontroverted evidence from the record below.

On February 22, 1988, Captain Wayne Harding of the State police internal affairs unit reported the results of the unit's investigation of Rivera.[4] The report detailed complaints by four female motorists against Rivera for improper behavior during traffic stops, all of which occurred in 1987.[5] The allegations ranged from Rivera's inviting female motorists to join him for a drink, to touching their arms, to detaining them for prolonged periods of time, to threatening them with a citation or arrest if they did not agree to go out with him. In addition to the verified complaints, the report also noted unsubstantiated "stories and rumors" about Rivera's activities. Opining that Rivera's actions toward female motorists were "totally inappropriate and

[4] The internal affairs investigation was triggered by a November, 1987, complaint by a female motorist to the State police. The complainant told investigators that during a stop of her vehicle on October 28, 1987, Rivera made "personal advances" toward her, including touching her arm and asking her out to dinner. He also allegedly asked her what she was like "in bed." The complainant, who was then eighteen years old, said Rivera asked her out for a drink, and when she said she was not old enough, he told her not to worry and that "he could get her in."

[5] Three of the four motorists had made no formal complaint to the State police but were identified during the internal affairs investigation.

unprofessional," Harding recommended that "Rivera be de[a]lt with in a manner that will show the victims of these incidents and the general public, that the Massachusetts State police will not tolerate these types of activities."

Colonel Thomas J. Fitzgerald, then deputy superintendent of the State police, reviewed the report and submitted it to Mc-Cabe.[6] Fitzgerald recommended that Rivera be terminated, and McCabe agreed.[7] McCabe instructed Fitzgerald to draft a letter advising Rivera of the contemplated charges against him (i.e., conduct unbecoming an officer), and his options of either resigning or proceeding with a court martial, known as a special trial board.[8] Fitzgerald's letter also stated Rivera "may be placed on permanent desk duty." McCabe testified at his deposition that such desk duty was not a disciplinary measure but a protective measure for the public, the department, and the officer, apparently while the charges were pending.[9]

McCabe did not have the authority to terminate Rivera directly, only to recommend to the trial board that such action be taken. See *Clancy* v. *McCabe, supra* at 501 n.10. The three-member trial board would have decided the accused trooper's guilt or innocence, and could recommend punishment up to and including discharge. If found guilty and terminated, Rivera could have appealed from the board's decision to the District Court. G. L. c. 22, § 9A (see St. 1971, c. 521), repealed by St. 1991, c. 412, § 19.

Rivera's attorney contacted McCabe and "a plea bargaining session" ensued. They discussed the fact — uncovered during a

[6]The deputy superintendent headed the division of State police. As Commissioner of Public Safety, McCabe oversaw the State police division, the division of fire prevention, and the division of inspections, as well as the bureau of administrative services.

[7]Fitzgerald testified at his deposition that he recommended Rivera be fired "[b]ecause [his behavior] wasn't in true accordance with the rules and regulations of a police officer in my opinion."

[8]The motion judge stated that "internal affairs investigators" recommended these options.

[9]The letter was addressed to Lieutenant Colonel Paul E. Lambalot of the office of field operations, ordering him to direct troop commander Captain Andre Lavoie to summon Rivera and advise him of the contemplated charges and possible disciplinary actions. It is unclear from the record whether a copy of the letter was sent to Rivera.

civil rights suit brought by a minority officer against McCabe's predecessor — that in the past thirty years, no white person had been discharged from the State police for conduct unbecoming an officer.[10] After a "great deal of conversation and consideration," according to McCabe, the parties agreed that Rivera would be suspended without pay for six months and thereafter report to the State police stress unit for counselling, for a period of time to be determined by the deputy superintendent.

McCabe testified at his deposition that he thought the punishment imposed "would be in the best interest of the department [and] the public, and give the officer an opportunity to straighten out his life." He acknowledged that the fact that Rivera was Cape Verdean weighed in his decision not to recommend termination, based on the department's previous experience with a civil rights suit by a minority officer.[11] Contrary to the motion judge's determination, however, McCabe's deposition testimony indicated that he "was not . . . in fear of any threat of a lawsuit."[12] What he feared, according to his testimony, was having an appellate court overturn any decision to terminate

---

[10]Rivera is Cape Verdean.

[11]McCabe testified that if the case "went to a trial board and [Rivera] was found guilty, he had a right of appeal to his own district court. If the district court overturned it, he was back on. It was as if it never happened. . . . [T]his thing had drawn on, but this is a way of bringing it to closure and to initiate progressive discipline so that notwithstanding any race or ethnic issues later on. If he had been punished and he had been counseled, there would be no standing of [minority] status on any further litigation."

[12]The relevant portion of the deposition transcript reads:

*Q*.: "Sir, as Commissioner of Public Safety in 1988, did you believe that you had an obligation to protect the public from the misconduct of State [p]olice [o]fficers?"

*A*.: "Yes, sir."

*Q*.: "And did you believe that you would exercise that obligation irrespective of a threat of litigation by the State [p]olice [o]fficer against whom the allegations had been lodged or that [S]tate trooper's attorneys?"

*A*.: "Yes. And I would like to clarify that. That was one of my considerations. I was not and am not in fear of any threat of a lawsuit. I was looking — I was evaluating what was on the table. And in addition to having an obligation to protect the public, I have an obligation to protect the department. And I have an obligation to protect the individual. He was one of my employees."

Rivera, resulting in Rivera's returning to work and "get[ting] a big reward of money for not having worked [which] would have had a debilitating effect on the department." Furthermore, McCabe testified that Rivera's ethnicity was only one consideration. McCabe also kept in mind that he had "an obligation to protect the public . . . an obligation to protect the department. And . . . an obligation to protect the individual [because Rivera] was one of [McCabe's] employees."

Rivera waived his right to a trial board hearing and was suspended from duty from August 1, 1988, through January 31, 1989. The suspension resulted in a loss to Rivera of about $25,000, based on an average trooper's salary plus overtime, court time and details. After returning to duty, Rivera received counselling, as ordered, from the State police department's psychological services unit, commonly known as "the stress unit."

The stress unit assisted employees with personal problems such as emotional or mental illness, alcohol abuse, or domestic problems. The members of the stress unit, including one who possessed a master's degree in social work, functioned as a "crisis intervention team" and provided counselling to State police employees. If the members were unqualified to handle an employee's particular issue, they referred the employee to outside professionals such as psychologists or psychiatrists.

Following his return to work, Rivera saw Richard Kelly, a member of the stress unit. Kelly possessed a bachelor of science degree in psychology and a master's degree in counselor education. Kelly estimated he counselled more than 1,200 people during his twelve years working in the stress unit.

McCabe acknowledged in his deposition that he believed the stress unit was inadequate to address Rivera's needs, but he believed the unit had "outsourced" Rivera for appropriate treatment. McCabe, however, did not order the unit to do so. Once McCabe had approved the six-month suspension and the order for Rivera to report to the stress unit, it became the deputy superintendent's responsibility to see that the punishment was carried out. McCabe himself did not follow up with the stress unit or otherwise monitor Rivera's behavior after Rivera returned to active duty.

Rivera was reassigned as a "road trooper" after his suspension ended. There were no restrictions placed on his duties. After returning to work in 1989, Rivera did not come before McCabe for any further disciplinary action. McCabe retired from State service in February, 1992.

2. *Discussion.* The doctrine of qualified immunity shields government officials, in the course of performing discretionary tasks, from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow* v. *Fitzgerald*, 457 U.S. 800, 818 (1982). "On a motion for summary judgment, 'the relevant question is whether a reasonable official could have believed his actions were lawful in light of clearly established law and the information the official possessed at the time of his allegedly unlawful conduct.' " *Febus-Rodriguez* v. *Betancourt-Lebron*, 14 F.3d 87, 91 (1st Cir. 1994), quoting *McBride* v. *Taylor*, 924 F.2d 386, 389 (1st Cir. 1991). First, however, the plaintiff must demonstrate that McCabe violated her federally protected rights under § 1983. See *Febus-Rodriguez* v. *Betancourt-Lebron, supra.* We must determine, therefore, whether the plaintiff has introduced sufficient evidence to create a genuine issue of material fact that McCabe violated her constitutional rights, and if so, whether he is otherwise entitled to qualified immunity. See *id.*; Mass. R. Civ. P. 56, 365 Mass. 824 (1974).

a. *Deliberate indifference.* To establish her claim of supervisory liability, the plaintiff must show that the relevant law was clearly established, such that McCabe knew or should have known that Rivera's conduct would violate a constitutional right of a third person. See *Dobos* v. *Driscoll*, 404 Mass. 634, 646-647, cert. denied sub nom. *Kehoe* v. *Dobos*, 493 U.S. 850 (1989). In addition, she must also prove that McCabe acted with "reckless or callous indifference" to those constitutional rights of third persons. See *Febus-Rodriguez* v. *Betancourt-Lebron, supra* at 92. Finally, "there must be an 'affirmative link' between the supervisory official's acts or omissions and his subordinate's violation of the plaintiff's constitutional rights." *Id.*, citing *Gutierrez-Rodriguez* v. *Cartagena*, 882 F.2d 553, 562 (1st Cir. 1989), and *Lipsett* v. *University of P.R.*, 864 F.2d 881, 902 (1st Cir. 1988).

McCabe makes no argument that in 1988 the law was not clearly established and thus he did not or should not have known that Rivera's harassment of female motorists would violate their constitutional rights. In our view, such a position would have been untenable. See *Dobos* v. *Driscoll, supra* at 650 (declaring that police supervisors in 1978 could be held liable under § 1983 for not protecting motorists from abusive officer). We therefore need not discuss that element of the plaintiff's claim, and proceed to the question of "reckless or callous indifference" (also called "deliberate indifference").

A supervisor may be liable under § 1983 if his "conduct or inaction amounted to a reckless or callous indifference to the constitutional rights of others." *Barreto-Rivera* v. *Medina-Vargas*, 168 F.3d 42, 48 (1st Cir. 1999), quoting *Gutierrez-Rodriguez* v. *Cartagena, supra* at 562. "An official displays such reckless or callous indifference when it would be manifest to any reasonable official that his conduct was very likely to violate an individual's constitutional rights." *Germany* v. *Vance*, 868 F.2d 9, 18 (1st Cir. 1989). We note that there is no significant difference between cases that utilize the standard of "gross negligence amounting to deliberate indifference" and those that employ "reckless or callous indifference." See *Gutierrez-Rodriguez* v. *Cartagena, supra.* "Indifference that rises to the level of being deliberate, reckless, or callous suffices to establish [supervisory] liability under § 1983." *Febus-Rodriguez* v. *Betancourt-Lebron, supra* at 92 n.4, quoting *Gutierrez-Rodriguez* v. *Cartagena, supra.*

"To demonstrate deliberate indifference a plaintiff must show (1) a grave risk of harm, (2) [McCabe's] actual or constructive knowledge of that risk, and (3) his failure to take easily available measures to address the risk." *Camilo-Robles* v. *Hoyos*, 151 F.3d 1, 7 (1st Cir. 1998), cert. denied, 525 U.S. 1105 (1999), citing *Manarite* v. *Springfield*, 957 F.2d 953, 956 (1st Cir.), cert. denied, 506 U.S. 837 (1992). " '[D]eliberate indifference' is a stringent standard of fault, requiring proof that a [State] actor disregarded a known or obvious consequence of his action." *County Comm'rs of Bryan County* v. *Brown*, 520 U.S. 397, 410 (1997).

To demonstrate the triability of the deliberate indifference

element, the plaintiff introduced the affidavit of Lou Reiter, a former Los Angeles deputy police chief with thirty-nine years of police experience, training, and professional involvement in police supervisory, management, and personnel practices. Reiter opined that McCabe "made a conscious choice to not use reasonable police supervisory techniques to change Rivera's attitude, behavior and performance deficiencies." One such technique, according to Reiter, would be committing Rivera involuntarily to professional psychological services. Other practices included evaluating citations to determine the percentage of females versus males stopped by Rivera; contacting females that Rivera stopped and inquiring about his conduct; and putting someone such as an undercover officer "in the field" as a motorist, to be stopped by Rivera so as to evaluate his behavior. Reiter stated that "[t]here is no indication that any of these [techniques] were even considered by the State Police and Commissioner McCabe."

However, even if McCabe's failure to take these or similar steps could be seen as negligent, it does not rise to the level of callous indifference. "Although . . . [McCabe] might have done more, such a rule is not the standard by which we judge [his] conduct." *Shaw* v. *Stroud*, 13 F.3d 791, 801 (4th Cir.), cert. denied, 513 U.S. 813, and 513 U.S. 814 (1994). After conferring with Rivera's attorney and considering the best interests of all those involved, including the State police department, McCabe imposed a six-month suspension, a financially weighty punishment that cost Rivera an estimated $25,000. In addition, McCabe ordered Rivera to receive treatment through the department's stress unit for what he believed to be Rivera's emotional problems. We do not view these disciplinary actions as a "failure to take easily available measures" to address the risk that Rivera would reoffend.[13] See *Camilo-Robles* v. *Hoyos*, *supra* at 7. Moreover, there is no indication in the record that

---

[13]The dissent, *post* at 326 (Ireland, J., dissenting), citing *Dobos* v. *Driscoll*, 404 Mass. 634, 657-658, cert. denied sub nom. *Kehoe* v. *Dobos*, 493 U.S. 850 (1989), asserts that there was sufficient evidence for a jury to conclude that McCabe "failed to take easily available measures to correct the problem." That case, however, is distinguishable. In *Dobos*, the court determined that four police supervisors were deliberately indifferent largely because they "chose to ignore" the officer's history of misconduct before disciplining and

McCabe believed that if he allowed Rivera to return to active duty, the trooper would continue to harass female motorists.[14] Cf. *Morrison* v. *Northern Essex Community College*, 56 Mass. App. Ct. 784, 800 (2002) (vacating summary judgment "on this record" as to whether college responded reasonably or indifferently to knowledge of coach's sexual misconduct).

In our view, as a matter of law, McCabe "simply did not exhibit the . . . 'deliberate indifference' to constitutional injuries" required to impose liability under § 1983. *Shaw* v. *Stroud, supra* at 801, quoting *Wellington* v. *Daniels*, 717 F.2d 932, 936 (4th Cir. 1983). See *Rogers* v. *Little Rock*, 152 F.3d 790, 800 (8th Cir. 1998) (holding that ten-day suspension for prior sexual misconduct of officer accused of rape did not demonstrate "deliberate indifference"); *Jones* v. *Wellham*, 104 F.3d 620, 626-627 (4th Cir. 1997) (holding that one month unpaid suspension of officer for alleged rape, coupled with transfer to desk duty and order to attend counselling, while perhaps imprudent or even negligent, did not constitute "deliberate indifference"). Cf. *Barreto-Rivera* v. *Medina-Vargas*, 168 F.3d 42, 49 (1st Cir. 1999) (deeming evidence sufficient to show deliberate indifference where officer had been disciplined thirty times, including six incidents leading to recommendations of dismissal; supervisor imposed fifteen-day suspension despite investigator's recommendation for dismissal, and later reduced another thirty-day suspension to two days). There is no evidence

subsequently returning him to highway duty (for the second time) with no monitoring or other probationary conditions. See *id.* at 656-658. Here, after considering the comprehensive internal affairs report on Rivera, McCabe not only suspended the trooper for six months without pay, but also ordered him to report to the stress unit. McCabe delegated oversight of the latter component of the sanction to Deputy Superintendent Fitzgerald, the supervisor who had recommended that Rivera be terminated. Such delegation was not unreasonable and provides insufficient evidence on which to rest a determination of deliberate indifference. See *Whiting* v. *Tunica County*, 222 F. Supp. 2d 809, 819 (N.D. Miss. 2002). See also *Camilo-Robles* v. *Zapata*, 175 F.3d 41, 46 n.2 (1st Cir. 1999) ("It is unrealistic to expect supervisors to reinvent the wheel on every action taken by their predecessors or subordinates. . . . For bureaucratic structures [or any other form of social organization] to function, the ability to delegate responsibility and to trust the judgments of others is essential").

[14]On the contrary, McCabe testified he thought that Rivera's "unstable emotional attitude," so described in Harding's report, "seemed to be part of the problem that could be fixed" by ordering Rivera to report to the stress unit.

that McCabe had failed to take adequate disciplinary measures against Rivera in prior multiple instances of violation of citizens' rights. Cf. *Shaw* v. *Stroud, supra* at 800. Rather McCabe acted promptly and forcefully in addressing the first report that he received of misconduct by Rivera.

Clancy also has failed to show that McCabe's action or omission was affirmatively linked to her injuries. See *Camilo-Robles* v. *Hoyos, supra* at 7 (stating that in addition to showing defendant's deliberate indifference, plaintiff must demonstrate causation). "[M]ere cause-in-fact does not suffice to establish the required affirmative link. If that were the test, every depredation of this sort would give rise to [supervisory] liability, for every § 1983 claimant harmed by such employee conduct could 'point to something the [supervisor] "could have done" to prevent the unfortunate incident.' " *Jones* v. *Wellham, supra* at 627, quoting *Canton* v. *Harris*, 489 U.S. 378, 392 (1989). Rather, this affirmative connection requires something more, such as "tacit approval of, acquiescence in, or purposeful disregard of, rights-violating conduct." *Camilo-Robles* v. *Hoyos, supra*, citing *Maldonado-Denis* v. *Castillo-Rodriguez*, 23 F.3d 576, 582 (1st Cir. 1994).

Here, the six-month unpaid suspension, while obviously a lesser punishment than termination, was sufficiently onerous to make clear that the department did not condone Rivera's conduct. In light of the department's initial pursuit of termination, it also signified that any further infraction would result in more severe discipline. This is not a case where the sanction imposed was so slight as to communicate the impression that Rivera could continue harassing female motorists without consequence. Cf. *Gutierrez-Rodriguez* v. *Cartagena*, 882 F.2d 553, 563 (1st Cir. 1989) (despite concerns about officer's behavior and knowledge of numerous civilian complaints against officer, supervisor gave him positive performance evaluations and continued to send him out on active duty; on "one or two occasions" he assigned officer to desk duty, officer demanded to be returned to street and supervisor complied); *Lipsett* v. *University of P.R.*, 864 F.2d 881, 914 (1st. Cir. 1988) (supervisors' reliance on biased complaints against plaintiff could amount to "encouragement or condonation of or

acquiescence in" sexually discriminatory behavior of subordinates). While the plaintiff may not have been injured but for McCabe's decision to keep Rivera on the force, this evidence is insufficient to establish the requisite link.

b. *Qualified immunity.* Although we conclude that summary judgment might have been granted solely on the plaintiff's inability to prove the essential elements of reckless indifference and causation, see *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 716 (1991), Federal case law suggests the need to inquire into McCabe's asserted defense of qualified immunity as well. See, e.g., *Camilo-Robles* v. *Hoyos*, *supra* at 7 ("The inquiry into qualified immunity is separate and distinct from the inquiry into the merits [of the plaintiff's case]. . . . In some circumstances, however, these inquiries overlap"). See also *Clancy* v. *McCabe*, 58 Mass. App. Ct. 498, 502 (2003).

As we stated at the outset of our discussion, the relevant inquiry on summary judgment as to the defense of qualified immunity is whether a reasonable official could have believed his actions were lawful, in light of clearly established law and the information possessed by the official at the time he acted. See *Anderson* v. *Creighton*, 483 U.S. 635, 641 (1987); *Febus-Rodriguez* v. *Betancourt-Lebron*, 14 F.3d 87, 92 (1st Cir. 1994). When so inquiring, we think it important to bear in mind the policy that informs the qualified immunity doctrine, namely "the need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." *Harlow* v. *Fitzgerald*, 457 U.S. 800, 807 (1982), quoting *Butz* v. *Economou*, 438 U.S. 478, 506 (1978).

In *Harlow* v. *Fitzgerald*, *supra*, the Supreme Court removed the subjective aspect, i.e., the actor's intent, from the qualified immunity standard it had articulated in *Wood* v. *Strickland*, 420 U.S. 308, 322 (1975).[15] See *Harlow* v. *Fitzgerald*, *supra* at 815-818. The "driving force" behind this reformulation of the

---

[15]Previously, "qualified immunity would be defeated if an official '*knew* or *reasonably should have known* that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff], *or* if he took the action *with the malicious intention* to cause a deprivation of constitutional rights or other injury' " (emphasis in original). *Harlow* v.

doctrine was the Court's desire "that 'insubstantial claims' against government officials be resolved prior to discovery and on summary judgment if possible." *Anderson* v. *Creighton, supra* at 640 n.2, quoting *Harlow* v. *Fitzgerald, supra* at 818-819. In short, "[i]mmunity ordinarily should be decided by the court long before trial." *Hunter* v. *Bryant,* 502 U.S. 224, 228 (1991), citing *Mitchell* v. *Forsyth,* 472 U.S. 511, 527-529 (1985).

Denying summary judgment in order to permit inquiries into McCabe's subjective state of mind contravenes the Supreme Court's intent to restrict the question of qualified immunity to "an objective inquiry into the legal reasonableness of the official action." *Anderson* v. *Creighton, supra* at 645, citing *Harlow* v. *Fitzgerald, supra* at 815-820. Thus, although "reasonableness" is often a classic question for the finder of fact, in cases such as this the reasonableness of the official's action should be treated as a question of law. See *Hunter* v. *Bryant, supra.*

Clancy complains that Rivera reported to the stress unit only a few times on his return and received grossly inadequate treatment and supervision, and furthermore that McCabe failed to monitor Rivera's treatment or performance once he returned to active duty. Our focus, however, is confined to the reasonableness of McCabe's order. First, as previously noted, McCabe imposed a lengthy and financially costly suspension on Rivera for behavior that clearly violated existing law. Recognizing that Rivera needed treatment, McCabe also directed him to the stress unit to seek such treatment, and delegated to Fitzgerald, the deputy superintendent, the responsibility of overseeing Rivera's return. There is no requirement that McCabe, who oversaw the entire Department of Public Safety, including the 1,200 to 1,400 employees of the State police department alone, personally supervise each subordinate over the course of that subordinate's discipline. See *Camilo-Robles* v. *Zapata,* 175 F.3d 41, 46 n.2 (1st Cir. 1999) ("For bureaucratic structures [or any other form of social organization] to function, the ability to delegate responsibility and to trust the judgments of others is essential"). Nor is there any basis for claiming that delegation of such

*Fitzgerald,* 457 U.S. 800, 815 (1982), quoting *Wood* v. *Strickland,* 420 U.S. 308, 322 (1975).

responsibility to Fitzgerald was itself unreasonable. Indeed, Fitzgerald was the one who had recommended firing Rivera after reviewing the results of the internal affairs investigation; there was no reason to believe that Fitzgerald would not see to it that Rivera and the stress unit follow through with an appropriate plan of treatment on Rivera's return. In sum, a reasonable official could have believed his actions were lawful, in light of clearly established law and the information possessed by McCabe at the time he acted.

We do not wish to minimize the severe trauma and humiliation that Rivera caused the plaintiff to suffer, which she described in graphic detail in a written statement contained in the record. However, as a matter of law, the plaintiff has failed to introduce sufficient evidence to create a triable issue that McCabe violated her constitutional rights. See *Febus-Rodriguez* v. *Betancourt-Lebron, supra* at 94. Moreover, McCabe "acted reasonably under settled law in the circumstances," *Hunter* v. *Bryant, supra* at 228, and thus he was entitled to summary judgment on the basis of qualified immunity.

The order denying summary judgment for McCabe is reversed. Judgment is to enter for the defendant McCabe.

*So ordered.*


IRELAND, J. (dissenting). I respectfully dissent from the court's opinion, because, in my view, the plaintiff has introduced sufficient evidence to reach a jury on the question whether the defendant's supervision of Rivera was so insufficient as to amount to deliberate indifference to the constitutional rights of female motorists. As the court correctly notes, *ante* at 318, to prove that a particular supervisor's actions or inactions amounted to deliberate indifference, the plaintiff must show that (1) there existed a grave risk of harm, (2) the supervisor had actual or constructive knowledge of the circumstances that created that risk, and (3) the supervisor failed to take easily available measures to correct the problem. *Figueroa-Torres* v. *Toledo-Davila*, 232 F.3d 270, 279 (1st Cir. 2000). In addition, the plaintiff must show that the supervisor's action or inaction

caused the plaintiff's harm.[1] *Id. Camilo-Robles* v. *Hoyos,* 151 F.3d 1, 7 (1st Cir. 1998), cert. denied, 525 U.S. 1105 (1999).

On this record, the plaintiff has presented sufficient evidence that Rivera's behavior created a grave risk of harm to female motorists. Furthermore, it is undisputed that in 1988 the defendant had actual notice of both a pattern of Rivera's menacing conduct toward female motorists and the severe sanctions recommended by the internal affairs unit. Specifically, on February 22, 1988, the defendant was presented with a report by the internal affairs unit of its investigation of Rivera's behavior. The report included detailed descriptions of complaints made by four female motorists against Rivera for inappropriate conduct, and mentioned that Rivera had been warned several times that his conduct could jeopardize his future employment with the State police.[2] Captain Wayne Harding of the internal affairs unit concluded that Rivera was "unfit to carry on the affairs of his office in a professional and creditable manner." Harding characterized Rivera's actions "in dealing with the female motoring public [as] totally inappropriate and unprofessional," and opined that Rivera had "at the very least an unstable, emotional attitude in dealing with female motorists." Harding concluded the report by recommending that Rivera be dealt with "in a manner that will show the victims of these incidents and the general public, that the Massachusetts State Police will not tolerate these types of activities." Harding's opinion, inherent in the report, was that Rivera should not be allowed to continue as a trooper.

---

[1] The third element of a supervisory liability claim, namely the requirement that the relevant law be clearly established so that the supervisor knew or should have known that his actions or inactions would lead to violation of constitutional rights of others, is not in dispute. See *ante* at 318.

[2] While "the failure of a police department to discipline in a specific instance" has been held insufficient to support a claim of deliberate indifference, *Santiago* v. *Fenton,* 891 F.2d 373, 382 (1st Cir. 1989), supervisors have been found liable for failing to take remedial action against subordinates after multiple complaints, especially for use of inadequate disciplinary systems effectively permitting officers to continue to violate citizens' rights. See *Shaw* v. *Stroud,* 13 F.3d 791, 800 (4th Cir.), cert. denied, 513 U.S. 813, and 513 U.S. 814 (1994) (supervisor's inaction in light of three complaints concerning subordinate's use of excessive force raised genuine issue of material fact whether supervisor acted with deliberate indifference); *Gutierrez-Rodriguez* v. *Cartagena,* 882 F.2d 553, 563-564 (1st Cir. 1989).

The jury also could have concluded that the defendant, possessed of this actual knowledge of Rivera's improper conduct, failed to take easily available measures to correct the problem. *Dobos* v. *Driscoll,* 404 Mass. 634, 657-658, cert. denied sub nom. *Kehoe* v. *Dobos,* 493 U.S. 850 (1989) (finding deliberate indifference where supervisors failed to impose proper safeguards on return to duty of trooper disciplined for prior abusive conduct toward motoring public). See *Camilo-Robles* v. *Hoyos, supra* at 12-14 (supervisor liable where he was on notice of subordinate's behavior likely to result in violation of citizens' constitutional rights, but failed to "take obvious steps within his power to reduce or eliminate that risk"). On receiving the report and discussing it with the deputy superintendent of the State police, who recommended that Rivera be terminated, the defendant initially decided to recommend that Rivera be discharged for "conduct unbecoming an officer." However, after negotiations with Rivera's counsel (as discussed *infra*), the defendant concluded that Rivera should be suspended without pay for six months and, on his return, be required to report to the State police counselling unit (also known as the "stress unit" or "stress team").[3] The defendant testified that he believed that the stress unit would not be able properly to address Rivera's needs. Nevertheless, he neither ordered that the stress unit refer Rivera to an outside professional, nor followed up with the stress unit on Rivera's progress. After returning from suspension, Rivera reported to the stress unit. Rivera testified at his deposition that he could not remember whether he had met with members of the "stress team" more than three times; he claimed he did not even know why he had been referred there. Rivera was reassigned as a road trooper with no restrictions on his road duties, no further discipline, no evaluation of his treatment from the stress unit, and no measures instituted to monitor his behavior.[4]

Contrary to the court's assertion, *ante* at 314-316, the record,

---

[3]Rivera was never required to acknowledge any wrongdoing.

[4]Lou Reiter, a retired deputy chief for the Los Angeles police department and an expert consultant and instructor on police practices, stated in his affidavit that any discipline of Rivera short of discharge should have incorporated easily available police supervisory practices and techniques to curb similar misconduct by Rivera in the future. According to Reiter, some of such easily available and reasonable measures that the defendant could have

through the defendant's own deposition testimony, amply supports the motion judge's conclusion that the defendant agreed not to recommend that Rivera be discharged because Rivera's counsel threatened to bring a racial discrimination suit against the department of State police on the ground that it had never terminated a white officer for "conduct unbecoming an officer." See *Simplex Techs., Inc.* v. *Liberty Mut. Ins. Co.*, 429 Mass. 196, 197 (1999) (in reviewing summary judgment, appellate court will "resolve all evidentiary inferences in favor" of non-moving party). The threat of a lawsuit does not justify the defendant's failure to take adequate steps to discipline Rivera and thereby prevent future violations of constitutional rights of female motorists. In addition, to the extent that the defendant's motivation is an issue of material fact, it cannot be resolved on a motion for summary judgment. Mass. R. Civ. P. 56, 365 Mass. 824 (1974). See *Augat, Inc.* v. *Liberty Mut. Ins. Co.*, 410 Mass. 117, 120 (1991).

Furthermore, there is sufficient evidence to create a genuine issue of material fact regarding the existence of an affirmative causal link between the defendant's conduct toward Rivera and Rivera's subsequent violation of the plaintiff's constitutional rights. See *Maldonado-Denis* v. *Castillo-Rodriguez*, 23 F.3d 576, 582 (1st Cir. 1994) ("A causal link may . . . be forged if there exists a known history of [a subordinate's] widespread abuse sufficient to alert a supervisor to ongoing violations [and] the supervisor . . . fails to take [adequate] corrective action, [such as] by . . . closer oversight . . . "). On this record, a jury could have concluded that, with "even the minimal amount of proper supervision and discipline," Rivera would not have been in the position to illegally strip search the plaintiff in November of 1992. See *Gutierrez-Rodriguez* v. *Cartagena*, 882 F.2d 553, 564 (1st Cir. 1989). A jury may have found that had

taken, but did not, included having supervisors (1) evaluate Rivera's citations, warnings, and recorded stops to determine the percentage of females versus males stopped to identify imbalance and alert the supervisors to possible discriminatory stops; (2) conduct "call-backs" to females stopped by Rivera to evaluate Rivera's performance, demeanor, and conduct during these stops; and (3) initiate an "integrity check" for Rivera by putting an undercover officer or a cooperating citizen in a position to be encountered in the field by Rivera, and evaluating his conduct.

the defendant not been deliberately indifferent to his duties, he would have taken appropriate steps to remedy "the Rivera problem" well before November of 1992. See *id.*

Finally, it goes without saying that police work, like teaching and medicine, is a line of work that intersects with many, if not all, sectors of society. The police perform a variety of roles: they serve the community by protecting life and property, preventing crime, enforcing the law, and upholding order for all citizens. One of the most important police functions is to create and maintain a feeling of security in communities. To that end, it is extremely important for the police to gain and preserve the public trust, maintain public confidence in the integrity of police officers, and avoid an abuse of power by law enforcement officials. In the context of this case, motorists, while anticipating the possibility of being stopped by the police for a traffic violation, trust that they will not then be subjected to extreme abuse and humiliation. Although Rivera's behavior alone betrayed that trust, the defendant's failure to "show the victims of these incidents and the general public that the Massachusetts State Police will not tolerate these types of activities" undermined that trust even more. Cf. *Brum* v. *Dartmouth*, 428 Mass. 684, 709 (1999) (Ireland, J., concurring, with whom Abrams and Marshall, JJ., joined) ("Underlying . . . the entire relationship between school and family is the parents' basic assumption that school officials will do all they can to protect the children who they entrust to the school's care"). In my opinion, police officials should, at the very least, "be expected to take reasonable measures to protect [the public] when they have advance notice of danger," *id.* at 710, especially when that danger comes from their own subordinates.