Connolly, Thomas E., J.
Plaintiff, the City of Boston (“City"), brought this action pursuant to G.L.c. 150C requesting this court vacate or modify an arbitration award[1] sustaining disciplinary charges brought by the Boston Police Department (“Department”) against Officer Noel Docanto (“Docanto”), but rescinding Docanto’s termination and instead imposing a six-month suspended sentence. The Boston Police Patrolmen’s Association (“Association”) opposes the motion. For the reasons discussed below, the City’s motion to vacate or modify the arbitration award is ALLOWED.
BACKGROUND
On March 3, 2005, the City terminated Docanto based on his involvement in a fight on December 21, 2003 and his subsequent actions pertaining to the fight. The Union grieved the termination and the parties submitted to arbitration the following issues: “Was the discharge of Grievant, Noel Docanto for just cause? If not, what shall be the remedy?” After two days of hearings, the arbitrator concluded that Docanto’s termination was not supported by just cause because it was not an appropriate penalty for his actions and instead imposed a six-month suspended sentence. The arbitrator issued her written decision on April 6, 2007. The arbitrator’s conclusion was based on the following factual findings.
Docanto had been employed as a patrol officer since March of 1995. Prior to his March 3, 2005 discharge, Docanto had not had any disciplinary actions taken against him and had received commendations for his police work on at least seven occasions. Docanto speaks Cape Verdean Creole, “a linguistic skill that is a relatively scare (sic) asset within the Police Department.”
On the night of December 20, 2003, Docanto, his girlfriend, his younger brother, and a friend of his younger brother’s went out. They took Docanto’s car, parked in the Prudential Center garage, and went to a club. Docanto had a few drinks at the club. At some point, Docanto met up with another of his brothers and two of his brother’s friends. The expanded group returned to the garage between 2:00 and 2:30 a.m. on December 21, 2003. The plan was to drive Docanto’s brother and his friends to their car which was parked outside of the garage. Because Docanto had consumed a few drinks, he had his younger brother drive.
Security cameras recorded the following events.[2] While trying to leave the garage, the younger brother pulled into a cashier’s lane that was closed with the exit barrier down. The younger brother backed the car up and tried to cut in front of a reddish car in the adjacent line, where cars were already in line, waiting to pay. An exchange occurred between the two cars’ occupants. The driver of the red car left his vehicle and the passengers in Docanto’s vehicle, including Docanto, exited their vehicle. The arbitrator noted that Docanto “appeared to be” the last one out of the car. A confrontation and physical altercation ensued between Docanto’s party and the driver of the reddish car, Michael Faysal (“Faysal”).[3] The initial encounter was not physical; instead there was some “squaring-up and posturing.” Then “for no immediately apparent reason, the level of intensity escalates” and the group moves around the garage. Faysal can be seen “posturing, assuming a boxing or fighting stance and moving forward, with his fists clenched, as if to say ‘bring it on.’ ” Faysal was outnumbered and “took a number of blows and kicks.”[4] Several times, Faysal’s friends attempted to intervene and security guards eventually called the police. After the altercation, Docanto ushered his brothers and their friends back to the car. Then he folded up the license plate, “evidently in an attempt to shield the vehicle from recognition.” The younger brother drove the car out of the parking lot, without paying. The arbitrator stated that “there was little indication that Faysal had suffered injuries.”
After Docanto’s party had left, the police arrived and an incident report was filed. The police identified the car as belonging to Docanto. Lieutenant Detective William McCarthy called Docanto on December 23, 2003 and asked him to come in for an interview. Docanto agreed, but after discussing his situation with colleagues, he sought advice from the Association’s counsel. An Association attorney called McCarthy who indicated that, at that time, he did not want to meet with either Docanto or his attorney. On December 31, 2003, an internal complaint was filed against Docanto with the Department’s Internal Affairs Division. At an interview, Docanto invoked his right against self-incrimination.
In early 2004, Docanto was charged with assault with a dangerous weapon (a shod foot) and arraigned in Boston Municipal Court. On October 5, 2004, Docanto was notified that internal administrative *580 charges were being brought against him for (1) violating Departmental Rules relating to Conduct, Conformance to Laws, and Public Integrity by engaging in assault and battery against Faysal; (2) neglecting his duty as a patrol officer by failing to stop the assault on Faysal; and (3) violating conduct standards by bending the license plate of his car in an attempt to conceal his identity. A hearing was held on December 3, 2004 regarding the internal administrative charges. On December 22, 2004, after negotiations, Docanto participated in an interview with an Assistant District Attorney and McCarthy with regard to the pending criminal charge against him. At that meeting, Docanto reviewed the security video footage, provided information about the other individuals involved in the altercation, and provided his account of the incident. On February 25, 2005, Docanto admitted to sufficient facts with respect to the assault charge and the case was continued without a finding for one year. Docanto was also ordered to attend anger management sessions for that year. He was not ultimately convicted of any crime stemming from the incident. On March 3, 2005, Docanto was terminated because all pending administrative charges against him had been sustained.
Although the arbitrator acknowledged that Docanto engaged in “serious misconduct,” i.e., he participated in a physical altercation, against an out-numbered opponent and, by bending up his license plate, tried to hide his involvement in the incident, she determined that Docanto’s termination was not an appropriate penalty for his activities.[5] She determined that “for this initial disciplinary offense, a substantial suspension appropriately penalizes” Docanto’s “off-duty misconduct.” The arbitrator relied on the following to support her conclusion: (1) she found that Docanto’s account of the “genesis of the altercation and its course” was “largely credible” and supported by the security tapes; (2) Docanto’s role in the altercation, the length of the encounter, and the amount of violence, were not as great as the City had asserted; and (3) termination of Docanto’s employment for an off-duty altercation, which was his only disciplinary offense in his ten years with the Department, was “excessive and unduly harsh.”
First, the arbitrator stated that Docanto was the only participant in the altercation to testify at arbitration.[6] The arbitrator credited his testimony because Docanto recounted both his good and bad actions, acknowledged his mistakes, and his recollections “mesh[ed]” with the recordings of the event.[7] Docanto stated that when they attempted to cut in front of Faysal’s car, Faysal left his car and came over to Docanto’s car. Faysal referred to one or more of the occupants of Docanto’s car as a “nigger,” “an epithet that explains why the young, black passengers began to pile out of the vehicle.” Docanto stated that he initially sought to calm down one of his brothers and to come between his younger brother and Faysal. Docanto said that Faysal “sucker punched” him. “From that point on, the Grievant testified, he wanted to have a one-on-one fight with Faysal and he approached that aim with ‘tunnel vision.’ In addition, the Grievant recalls his brothers and their friends becoming infuriated at Faysal’s blow, with their anger leading to the escalation of the conflict.” Docanto stated that for the next few minutes all he wanted to do was fight Faysal. Faysal “appeared to be eager for a confrontation.” Faysal continued to “issue taunts and, in effect, egg the fight on.” Although the arbitrator found that Faysal “in effect, lit the fuse on the explosive situation,” she said that it did not excuse Docanto’s “heated response.” The arbitrator concluded: “The Grievant’s pursuit of Faysal, and the assault, were simply wrong. But, the context in which the misconduct occurred— coming after some provocátion — and the fact that it happened in the heat of the moment, rather than as the result of calm deliberation or other inappropriate motivation, are factors to consider when evaluating an appropriate disciplinary consequence for the Grievant’s actions.”
Next, the arbitrator found that Docanto’s role in the altercation, the length of the encounter, and the degree of violence in the encounter, were not as great as the City asserted. The arbitrator did acknowledge, however, Faysal was outnumbered and received a number of blows, had a traffic barrier thrown at him, and while on the ground, received a number of substantial kicks and other blows. The arbitrator referenced Acting Commissioner Goslin’s testimony that, in recommending Docanto’s discharge, he viewed the incident as a joint venture by all the assailants and that because Docanto was a police officer, he bore equal or greater culpability than the other participants in the encounter. The arbitrator disagreed with this conclusion. The arbitrator stated that the recording corroborates Docanto’s testimony that he wanted to have a one-on-one fight with Faysal. The recording shows Docanto pushing siblings and friends aside to get to Faysal. Faysal’s female colleague is also pushed. Further, the recording “rarely shows the Grievant actually coming into contact with Faysal.” Although Docanto tries to make contact with Faysal, he is not very successful. In addition, Docanto “grabbed at, or grappled -with, Faysal when he was on the ground (and being subjected to kicks and blows) and, apparently, managed to get Faysal up onto his feet. While the Grievant may have helped haul Faysal to his feet in an attempt to have a personal confrontation with him, his action also served to get Faysal away from the persistent blows he received from others, while he was on the ground.”
The arbitrator stated that the recording showed that the other participants in the altercation were far more active than Docanto. Docanto was the last one out of the car, he testified that he initially tried to defuse the situation, and his participation consisted of trailing the group or pushing others aside to have a *581 solo fight with Faysal. Docanto did not direct or coordinate an attack on Faysal. In addition, “the heated portion of the altercation” lasted about three minutes and, therefore, was not “particularly protracted or prolonged.” Docanto also testified that he tried to stop the altercation after his girlfriend caught his attention. The recording shows Docanto “corralling” his brothers and their friends back to the car. The arbitrator noted that Docanto’s actions in stopping the assault did not appear to have been acknowledged by the City. However, after the altercation, the arbitrator stated that Docanto “went on the commit another serious transgression.” Specifically, Docanto bent up his license plate. The arbitrator was “convinced that the Grievant took that measure in an effort to avoid detection for his role in the altercation.” The arbitrator said that Docanto’s action was wrong and Docanto conceded that at arbitration. She concluded that although Docanto’s behavior was “offensive, way out-of-line and worthy of substantial discipline,” his action were not as “violent, prolonged, sustained or egregious” as the City alleged.
Finally, the arbitrator found that termination for an off-duty alteration was an excessive penally for his “established misconduct.” The arbitrator said that a central element of just cause is that a disciplinary penalty should be proportional to the misconduct keeping in mind that discipline is corrective rather than punitive and considering mitigating factors. In support of her decision, the arbitrator stated that Docanto had been a police officer for ten years, he had an unblemished disciplinary record before this incident, had earned a number of commendations, and spoke Cape Verdean. “These factors militate against the Grievant’s discharge for an initial offense involving off-duty misconduct. Under the circumstances, a substantial suspension, rather than discharge, would be an appropriate corrective penalty.”
In addition, just cause requires the City to discipline employees who engage in similar conduct in a like manner. The arbitrator found that Docanto had been treated much more harshly than other employees who had engaged in off-duty misconduct. The arbitrator found no occasion where a police officer had been discharged for a single off-duty incident involving assault, when the officer had no prior discipline and no criminal conviction. The arbitrator also noted that Docanto is not statutorily disqualified from continued employment as a patrol officer because his criminal matter was continued without a finding. The arbitrator concluded that Docanto’s termination was not supported by just cause and reduced the termination to a six-month suspension.
The Ciiy has appealed this decision.
DISCUSSION
A court is “strictly bound by an arbitrator’s findings and legal conclusions, even if they appear erroneous, inconsistent, or unsupported by the record at the arbitration hearing.” Lynn v. Thompson, 435 Mass. 54, 61 (2001). “A matter submitted to arbitration is subject to a very narrow scope of review. Absent fraud, errors of law or fact are not sufficient grounds to set aside an award.” Plymouth-Carver Regional Sch. Dist. v. J. Farmer & Co., 407 Mass. 1006, 1007 (1990); see also Boston v. Boston Police Patrolmen’s Ass’n, 443 Mass. 813, 818 (2005) (stating that there is a strong public policy favoring arbitration); Trustees of Boston & Me. Corp. v. Massachusetts Bay Transp. Auth., 363 Mass. 386, 390 (1973) (“Even a grossly erroneous decision is binding in the absence of fraud”). A court’s deference to arbitration is “especially pronounced” when the parties’ choice to resolve their disputes through arbitration forms part of a collective bargaining agreement. Boston, 443 Mass. at 818 (citation omitted).
The City does not allege that there is fraud in this case; instead, the City argues that the arbitration award should be set aside on the ground that the arbitrator exceeded her powers by construing the collective bargaining agreement in a manner that violated public policy. See G.L.c. 150C, §11(a)(3) (“[T)he Superior Court ’shall’ vacate an [arbitration] award if . . . the arbitrators exceeded their powers or rendered an award requiring a person to commit an act or engage in conduct prohibited by state or federal law”). A court will not permit an arbitrator to order a party to engage in an action that offends strong public policy. Boston, 443 Mass. at 818 (citations omitted); see also Massachusetts Highway Dep’t v. American Federation of State, County, and Municipal Employees, Council 93, 420 Mass. 13, 16 (1995) (noting that such an award is beyond the arbitrator’s powers). The question of public policy is one of the court and not an arbitrator. Boston, 443 Mass. at 818.
The court applies a “stringent, three-part analysis to establish whether the narrow public policy exception requires [the court] to vacate the arbitrator’s decision.” Boston, 443 Mass. at 818.
To meet the criteria for applications of the public policy exception, the public policy in question must be well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests . . . The public policy exception does not address disfavored conduct in the abstract but [only] disfavored conduct which is integral to the performance of employment duties . . . Finally, we require a showing that the arbitrator’s award reinstating the employee violates public policy to such an extent that the employee’s conduct would have required dismissal.
Lynn, 435 Mass. at 62-63 (citations and internal quotations omitted) (emphasis in original). See also Boston, 443 Mass. at 814 (vacating arbitration award reinstating a police officer because the officer’s “continued employment as a police officer would frustrate *582 strong public policy against the kind of egregious dishonesty and abuse of official position in which he was proved to have engaged”). “If an award is permissible, even if not optimal for the furtherance of public policy goals, it must be upheld.” Massachusetts Highway Dep’t, 420 Mass. at 19.
As discussed above, the arbitrator in the present case sustained the disciplinary charges against Docanto, but revoked his termination. Specifically, although the arbitrator found that Docanto engaged in “serious misconduct,” i.e., he participated in a physical altercation, against an outnumbered opponent and, by bending up his license plate, tried to hide his involvement in the incident, she determined that Docanto’s termination was not an appropriate penalty for his activities. This Court finds that the arbitrator exceeded her authority by rendering an award that is inconsistent with public policy.
This Court finds that all three prongs of the public policy exception are present here. First, the public policy is “well defined and dominant” and “ascertained by reference to the laws and legal precedents.” For example, G.L.c. 41, §96A states that “[n]o person who has been convicted of any felony shall be appointed as a police officer of a city, town, or district.” See also Boston, 443 Mass. at 821 (noting that the Legislature has forbidden persons who have committed a felony from becoming police officers, and, “by implication, from remaining police officers”). Docanto was charged with assault with a dangerous weapon; he later admitted to sufficient facts with respect to the assault charge. Even though he ultimately was not convicted of any crime stemming from the incident, “ [i]t is the felonious misconduct, not a conviction of it, that is determinative.” Boston, 443 Mass. at 820.
In addition, the Legislature has “specifically mandated” that the commissioners of the Boston Police take all necessary actions to uphold the integrity of the officers under their command and, when necessary, punish misconduct and terminate officers’ employment. Boston, 443 Mass. at 821, citing St. 1962, c. 322, §1 (police commissioner of Boston “shall have cognizance and control of the government, administration, disposition and discipline of the department, and of the police force”). Pursuant to this authority, the commissioner has issued “clear, explicit regulations” against certain misconduct in which Docanto engaged. Boston, 443 Mass. at 821. For example, the Boston Police Department Rules and Procedures, Rule 102, Section 3, states: “Employees shall conduct themselves at all times, both on and off-duty, in such a manner as to reflect most favorably on the Department. Conduct unbecoming an employee shall include that which tends to indicate that the employee is unable or unfit to continue as a member of the Department, or tends to impair the operation of the Department or its employees.” Section 35 states:
Employees shall obey all laws of the United States, of the Commonwealth of Massachusetts, all City of Boston ordinances and by-laws and any rule or regulation having the force of law of any board, officer, or commissions having the power to make rules and regulations. An employee of the Department who commits any criminal act shall be subject to disciplinary action up to and including discharge from the Department. Each case shall be considered on its own merits, and the circumstances of each shall be fully reviewed before the final action is taken.
Finally, the Boston Police Department Rules and Procedures, Rule 113 deals specifically with public integrity. Section 5 sets forth Canons of Ethics because “history and sound judgment indicate that violations of these canons severely undermine the ability of the Department to gain the confidence of both its employees and the public, and also negatively affect its ability to fulfill its essential mission.” Cannon 8 states: “Employees shall conduct their private affairs so as not to reflect unfavorably on the Boston Police Department; or in such a manner as to affect their ability to perform their duties honestly, effectively, fairly, and without impairment.” Therefore, the public policy requiring police officers to obey the law and not attempt to cover up their involvement in criminal activity is “well defined and dominant” and “ascertained by reference to the laws and legal precedents.” See U.S. Postal Service v. American Postal Workers Union, 736 F.2d 822, 825 (1st Cir. 1984) (upholding the district court’s decision to vacate an arbitration award reinstating a postal employee who embezzled postal funds in part because “the [public] policies . . . are not only defined by positive law, but are also the clear dictates of common sense”).
Next, the conduct which the arbitrator found that Docanto had engaged in is “integral to the performance” of Docanto’s employment duties even though Docanto was off-duty when the incident occurred. See Boston v. Boston Police Patrolmen’s Ass’n, 8 Mass.App.Ct. 220, 221 n.1 (citation omitted) (“The fact that the officer was off-duty does not remove his action from the review of the police commissioner”). Docanto is a police officer and is required to uphold the law and ensure that others are upholding the law. Docanto instead broke the law and then tried to evade detection. His status as a police officer makes his conduct all the more egregious. As stated in Boston, “(o]ne of the most important police functions is to create and maintain a feeling of security in communities. To that end, it is extremely important to gain and preserve public trust, maintain public confidence, and avoid an abuse of power by law enforcement officials.” 443 Mass. at 819, quoting Clancy v. McCabe, 441 Mass. 311, 328 (2004) (Ireland, J., dissenting).
This Court also finds that the arbitrator’s award reinstating Docanto violates public policy to such an *583 extent that the employee’s conduct would have required dismissal. See Boston, 443 Mass. at 819 (stating that City must demonstrate that public policy requires that the policeman’s conduct, as found by the arbitrator, is grounds for dismissal, and that a lesser sanction would frustrate public policy). Although she later explained away his actions, the arbitrator found that Docanto’s pursuit of Faysal, and the assault, were “simply wrong.” The arbitrator also specifically found that Docanto’s attempt to hide his involvement in the altercation by bending up the license plate was “a serious transgression,” and “offensive, way out-of-line and worthy of substantial discipline.”[8]
Given the arbitrator’s findings, Docanto’s continued employment as a police officer would frustrate strong public policy against the kind of egregious conduct in which Docanto was proved to have engaged. Therefore, this Court vacates the arbitration award. See Boston, 443 Mass. at 823 (“The public policy against requiring the reinstatement of police officers who have committed felonious misconduct stems from the necessity that the criminal justice system appear legitimate to the people it serves”); Cf. Massachusetts Highway Dep’t, 420 Mass. at 18 (“Arbitration awards reinstating discharged employees also are vacated if the award violates a public policy which relates to the employee’s job and which exists because the job itself makes the employee’s conduct an immediate threat to the general public”).[9]
ORDER
For the above discussed reasons, it is hereby ORDERED that the City of Boston’s motion to vacate or modify the arbitration award is ALLOWED.
It is furthered ordered that the arbitration award and order be vacated and that the decision of the Boston Police Department terminating Officer Noel Docanto be reinstated and said decision is AFFIRMED.

The City moved for a stay of the arbitrator’s decision pending the outcome of its petition to vacate or modify the arbitrator’s' award. This decision renders that motion moot.

The arbitrator noted that the real time security video recording had several deficiencies, i.e., it does not have sound, it does not clearly show all aspects of the encounter, there are garage pillars impeding the view at some points, and it is difficult to “isolate and specifically identify individuals,” because they are dressed in black and the color on the video and light level are not good. There was also a compact disc containing still images of the beginning part of the encounter with unrecorded intervals between each image.

A friend of Faysal’s was in another car and a female colleague was also present.

Specifically, the arbitrator stated: “The dynamics of the encounter were more complex than the incident portrayed by the City. Faysal was not a helpless and innocent victim set upon by a mob. The recording demonstrates that, initially, Faysal was a willing and provocative participant in, or instigator of, a melee. The situation, however, quickly got out of hand, the level of violence escalated and Faysal was quickly outnumbered and overpowered.”

The arbitrator noted that the grounds for Docanto’s termination were the assault on Faysal and bending up the car’s license plate and that there was no indication that leaving the scene, failing to provide medical assistance, or failing to report the incident were aspects of Docanto’s misconduct which led to his termination. The arbitrator stated that the misconduct not relied upon for the termination could not “be relied upon now to justify the imposed disciplinary penalty.”

The arbitrator pointed out many times that Docanto’s testimony was unrebutted at arbitration and was not contradicted by any aspect of the available recorded evidence.

The arbitrator did not rely solely on the video because “the recording does not give a clear indication of how or why the incident commenced and why its intensity escalated.”

In addition, although not discussed by the arbitrator, the arbitrator stated that at an interview regarding the December 31, 2003 complaint filed against him by the Department’s Internal Affairs Division, he invoked his right against self-incrimination and did not provide information regarding the incident until December 22, 2004.

Additionally, the arbitrator’s finding that Docanto had been treated much more harshly than other employees who had engaged in off-duty misconduct is not determinative. Boston, 443 Mass. at 822 n.9 (“That other police officers may have received lesser sanctions for their serious misconduct avails nothing here. Each case must be judged on its own facts, and the factual record in those cases is not before us. In any event, there is no suggestion that the reasons for [the officer’s] termination were pretexts or motivated by improper considerations.”).